## GEORGE M. HODGES, CITY TAX COLLECTOR, ETC., v. WESTERN UNION TELEGRAPH COMPANY.

MUNICIPAL CORPORATIONS.    *Telegraph companies.    Use of streets.    Right of city to charge rent.*

The power of a municipality over its streets, under an ordinary char-
ter, is subject to legislative control, and, hence, an ordinance ex-
acting rent from a telegraph company for the use of streets for its
poles, is void, because in contravention of the act of 1886 (Laws, p.
93), which provides that any telegraph company shall "have the
right to construct, operate and maintain telegraph lines . . on,
across, or along all . . streets," etc., making no provision for
compensation to cities and towns. *Donnaher* v. *State*, 8 Smed. & M.,
649, criticised.

FROM the circuit court of Lauderdale county.

HON. S. H. TERRAL, Judge.

Action by the city of Meridian against the Western Union
Telegraph Company, to recover rent claimed to be due for the
use, by the defendant, of the streets of the city for its telegraph
poles.    The demand is based upon an ordinance of the city,
passed in June, 1893, requiring all telegraph companies doing
business in the city to pay, as rent to the city, the sum of $2.50
per annum for each telegraph pole erected and used in the
streets, alleys and public places therein.    The sole question pre-
sented is the validity of said ordinance.    The facts touching
this question sufficiently appear in the opinion.    The case was
tried in the circuit court, without a jury, and resulted in a
judgment for the defendant.

*Cochran & Bozeman*, for appellant.

The ordinance is copied from an ordinance of the city of St.
Louis, the validity of which was sustained in the case of *St.
Louis* v. *Telegraph Co.*, 148 U. S., 92.    It was conceded that,

if the charter of Meridian confers as complete control over its streets as does the charter of St. Louis, appellant should have had judgment. The charter of Meridian gives it full power to keep in repair all necessary streets, alleys, avenues, etc., and to pass all necessary regulations for the same. It gives the city full power to regulate the use of streets. In the said case of *St. Louis* v. *Telegraph Co.*, on rehearing (149 U. S., 465), the court said: "The word 'regulation' is one of broad import. It was a word used in the federal constitution to define the powers of congress over foreign and interstate commerce, and he who reads the many opinions of this court will perceive how broad and comprehensive it has been held to be." The court in that case further says: "Unless, therefore, the telegraph company has some superior right which excludes it from subjection to this control of the city over its streets, it would seem that the power to require payment of some reasonable sum for the exclusive use of a portion of its streets was within the grant of power to regulate the same."

The charter of Meridian further gives the power to pass all ordinances, by-laws and resolutions necessary and requisite for the government of said city and the welfare of its inhabitants, provided the same shall not be contrary to the constitution and laws of the state. It seems difficult to frame a provision broader and more sweeping than this. The charter, moreover, empowers the city to grant rights of way to railroad companies for the construction of railways over the streets and through and over the public property of the city. Certainly this is a recognition of the rights as to the streets and public property of the city.

*Mayes & Harris*, for appellee.

The case of *St. Louis* v. *Telegraph Company*, 148 U. S., 92, is not authority in this case unless it can be shown that the city of Meridian stands upon the same footing as the city of St. Louis, as to its powers. In that case the court says that the

city of St. Louis occupies a unique position.   Its powers were
not derived by legislative grant, but it framed its own charter
under express authority of the people of the state, given in the
constitution.   Its charter is an organic act, and the city of St.
Louis is in a just sense an *imperium in imperio.*   On the con-
trary, the charter of the city of Meridian and the powers of its
municipal authorities come directly from the legislature, and
the legislature, so far as regards the rights of the city over its
streets, possesses unlimited control.   See 15 Am. & Eng. Enc.
L., 988; 24 Iowa, 455; 25 N. Y., 526; 27 *Ib.*, 188; 14 Wis.,
609; 36 Pa. St., 99; 13 La. Ann., 326; 88 Am. Dec. 148; 15
B. Mon. (Ky.), 642; 34 Iowa, 249; 88 Ill., 317; 47 Pa. St.,
349; 45 Iowa, 338; Dill. Mun. Cor., § 702, and cases cited in
note; *Meriwether v. Garrett,* 102 U. S., 472.   Our contention
does not in any way entrench upon the rights of abutting owners
or private individuals whose property is affected by the use of
the streets.   The act of 1886 makes no provision for compen-
sation to cities, but only provides for compensation where pri-
vate rights are invaded.   The right of the telegraph company,
in this case, rests upon express legislative permission to use the
streets and public highways without compensation.   This is not
an attempt to evade paying taxes; these are provided for else-
where.   The demand is for rent in addition to taxes.   The judg-
ment should be affirmed.

WHITFIELD, J., delivered the opinion of the court.

The ground upon which the ordinance of the city of St.
Louis, of which the one in this case is said to be a copy, is
placed in 148 U. S., 92, and 149 U. S., 465, is that the city
of St. Louis is the absolute owner of the fee in its streets, and
the charter powers of the city are "self-appointed."   It is
expressly declared that St. Louis occupies "a unique position.
It does not, like most cities, derive its powers by grant from
the legislature, but it framed its own charter under express
authority from the people of the state, given in the constitu-

tion;'' and, again, it is said, '' this charter is an organic act, so defined in the constitution, and is to be construed as organic acts are construed. The city is, in a very just sense, an *imperium in imperio.* Its powers are self-appointed, and the reserved control existing in the general assembly does not take away this peculiar feature of its charter.'' Treating the city, therefore, as the absolute and uncontrolled proprietor of its streets, rent—which is, like toll, a '' demand of proprietorship,'' and not like a tax, a '' demand of sovereignty ''—was declared to be within the power of the city to exact. Meridian occupies a very different attitude as to its streets and its power over them. All the power which it has over its streets is derived from the legislature, whose power over them is '' supreme and transcendent,'' to use Judge Dillon's language. We are not advised, by the record, whether the fee in the streets of Meridian is in the city, or whether the city has a mere easement, but it is not denied that the power of the city to deal with the streets is derived wholly from a charter granted by the legislature, and hence; of course, under legislative control.

The legislature, by the act of 1886 (Laws, p. 93, § 1), provided '' that any telegraph company chartered by the laws of this or any other state of the United States, shall, upon making due compensation, as hereinafter provided, have the right to construct, maintain, and operate telegraph lines . . on, across and along all . *.* streets,'' . . etc.; *provided,* that '' there shall be no interference with the ordinary use of such streets,'' etc., or with '' the convenience of any landowner more than may be unavoidable.'' The following sections provide for compensation to turnpike and railroad companies, and private owners, for the use and occupation of their '' ways,'' '' structures '' or lands. No compensation was provided for cities in case their streets should be used, but the use and occupation of so much of the streets of cities as may be reasonably needed for the construction and maintenance of telegraph poles and telegraph lines, is expressly authorized without compensa-

tion to the state or to the cities, municipal subdivisions of the state. Without this act, the appellee could not have entered upon the streets of the city of Meridian for the purpose of constructing and maintaining its telegraph lines, and under it it could only have so entered and occupied its streets with its poles by virtue of the right of eminent domain, upon due compensation first made, had not the terms of the act clearly shown that such compensation was dispensed with. Had such compensation been required—such damages awarded, in such exercise of the delegated right of eminent domain, such compensation would have been made, such damages awarded, for the use and occupation of said streets by said telegraph company with its poles, wires, etc., and it is this identical use and occupation for which the city seeks here to recover rent under the ordinance in question. The ordinance is entitled "An ordinance to fix the rent charged telegraph . . companies . . for the use of the streets," etc. It is manifest that if the state, having "supreme and transcendent" power over the streets of Meridian, granted the appellee the right to so use and occupy the streets without compensation to the state or the city, then the city of Meridian, a political municipal subdivision of the state, cannot, by ordinance, affect the license thus granted. It is revocable at the pleasure of the state, but not of the city, unless granted such power by the state, so far as affects it.

It is to be noted that this is not a tax. The license is a mere permission to enter the streets of the city, and so use and occupy them, without paying the damages usually assessed and paid, where the right of eminent domain is used for condemning rights of way in streets, etc. It is a permissive statute—what it grants is a mere license, revocable by the state. 148 U. S., 102. It was not intended to exempt the appellee from the "ordinary burdens of taxation." But this is not a tax, and the scheme for the taxation of telegraph companies is elsewhere fully provided. Code 1892, §§ 3885, 3880. And this scheme is directed to be so arranged that "each municipality shall re-

ceive its just share of such taxes proportionately to the amount of the property therein situated.''

The act conferring the charter powers, it will be noted, was passed prior to the act of 1886—April 9, 1874. We have nothing to do with the wisdom of the act of 1886, doubtless passed at the instance of telegraph and telephone companies, but under its provisions feel constrained to affirm the judgment. See Dil. Mun. Corp., 4th ed., § 701, *et seq.; People* v. *Kerr,* 27 N. Y., 188; *Meriwether* v. *Garrett,* 102 U. S., 472; 15 Am. & Eng. Enc. L., p. 988, and authorities cited. We are not to be understood as denying or restricting the power of the city to regulate the use of its streets within legal limits. See Elliott on Roads and Streets, pp. 332, 333. This is not an ordinance regulating the use of its wires and poles by the company, nor the use of the streets by the company in the occupation of them by its poles, but one exacting from the company a certain sum as rent, pure and simple, for the identical entry upon and occupation of the streets by the company with its poles, which it was authorized by the act of 1886, to make without compensation to the state or city, in the exercise of the right of eminent domain. The act, it will be observed, provides that such use of the streets must not interfere with their ordinary use as such.

In *City of Clinton* v. *Railroad Co.,* 24 Iowa, 455, Dillon, C. J., speaking for the court, says: '' By virtue of these charter provisions and this ownership of the fee, the city claims that it has the exclusive control of the streets, and, therefore, it may consent to or prohibit, as by its common council it shall deem best for the public interest, the use of its streets for railway purposes, and that the courts cannot interfere with or control the decision of the common council respecting this matter, whatever that decision may be. If these were all the provisions of the law applicable to this subject, the position of the city might, and, I think, would, be well taken.'' He then proceeds to notice two other statutes of similar purport with

our act of 1886, *supra*, as affecting this question, and then, at p. 473, continues: "But it is a mistake to suppose that, when the fee of the streets is in the city, in trust for the public, the city is constitutionally and necessarily entitled to compensation, the same as a private proprietor holding the fee. . . The constitutional provision is that private property shall not be taken for public use without just compensation to the owner. The streets of the city are not the private property of the corporation in such a sense that the legislature cannot, so far as regards the corporation, authorize the same to be used for any public purpose for which it may see fit, unless it makes compensation to the city for such use."

We refer specially to the entire reasoning in this case. Of course, the use of the streets by the telegraph company is "subject to all reasonable police and other regulations," in Judge Dillon's language in another part of this opinion; and as we have shown, no question of taxation is here involved, nor any private rights of any "landowner."

The case of *Donnaher* v. *State*, 8 Smed. & M., 649, though not referred to by counsel, has not escaped our careful attention. We are disposed to think that the decision, in that case, may possibly be upheld on the ground that, as urged by the distinguished counsel for appellee, the late Judge William Yerger, the charter of the railroad company expressly stipulated that the company could not make its road "so as to interfere with the passage of any of the public streets of the town;" from which it might have been argued, as he did argue, that the tracks could not be laid in the streets at all, so far as the railroad's charter power to do so was concerned. It would seem that the court, however, went rather on the ground that, as stated in the opinion, "the statute of 1823 reserved to the legislature the right to dispose of the entire two sections of land, designated by the commissioners to locate the seat of government, except the streets," etc., and hence, that "this vested the title to the streets in the corporation of the city, and de-

prived the legislature of the power to dispose of them, except so far as the *jus publicum*, or the right of eminent domain, might authorize it." If the decision is sound—and it must be remembered that Mr. Justice Thacher dissented—it is only on the first ground. Otherwise, the decision, like the general language of the opinion of the majority of the court, speaking through Mr. Justice Clayton, is justly amenable to the criticism pronounced on it by Judge Dillon, in the second volume (4th ed.) of his work on Municipal Corporation, § 701, note 3, p. 834, where he says: "A different view has been sometimes taken. Thus, in *Donnaher* v. *State*, 8 Smed. & M., 649, the court decided that, where the statute under which a city was laid out vested the title of the streets in the city, such streets cannot be subjected to the use of a railroad, without the consent of the city, unless the damages to the city are assessed and paid. In other words, the legislature can only interfere with the use of the streets of the city by its exercise of the right of eminent domain; and, if it exercise this right, it must compensate the city. But this conclusion seems to have been adopted without sufficient reflection, and is undoubtedly erroneous," citing authorities. "The ground on which the city of Jackson stands was given to the state of Mississippi by the general government," as said by Judge Yerger in his brief; and this fact, connected with the " reservation of the right to the legislature to dispose of the entire two sections of land, except the streets," etc., hereinbefore adverted to as emphasized by the court, seems to have confused Judge Clayton, at least to have left him with rather indistinct conceptions of the power of the legislature, generally, to deal with the streets of a city, for we find him saying, p. 660, that "this principle" of compensation being made for private property taken for public use, "applies as forcibly to the streets, in this instance, as to private property in other cases," seemingly holding that the streets of Jackson are its "private property" in the same sense that any individual's property is his "private

property," and the case he immediately cites—*Canal Co.* v. *Railroad Co.*, 11 Leigh (Va.), 42—is one of a canal company against a railroad company, both private, not municipal, corporations. And a more extraordinary thing still is the announcement on p. 661, that "at present we are strongly inclined to the belief, that the owners of lots adjacent to the track of the railroad will have no claim to compensation," because "they have no right of soil in the streets," a proposition the converse of which is everywhere now established law. We are not, of course, saying here anything as to the streets of Jackson, but are merely putting this case of *Donnaher* in its only solvable light, as to the particular decision therein made, if, in that light, it be solvable. In so far as the general language of the opinion of the court, in that case, conflicts with the views herein announced, it is, as said by Judge Dillon, "undoubtedly erroneous," and is, to that extent, hereby overruled.

*Affirmed.*