## OKLAHOMA RY. CO. v. POWELL *et al.*

No. 3544.    Opinion Filed November 7, 1912.

(127 Pac. 1080.)

**CARRIERS—Street Railroads—Regulation—Transfers—Corporation Commission.** The Corporation Commission ordered: "That on all days except Sundays, between the hours of six and eight a. m. and five-thirty and eight p. m., the defendant (appellant), the Oklahoma Railway Company, shall give transfers when requested by the passenger and that said transfers be honored at any point on the line for which they are marked. Between the hours of six and eight a. m. when two cars meet on a parallel track, they shall stop for the transfers of passengers. Example: If a University car going west on Main street between Broadway and the terminal should meet a Capitol Hill or Stock Yards car, both cars shall stop to transfer passengers if they have any. Between six and eight a. m., as one car is entering the terminal from Main street, if at the same time another car is coming out on Main street, and passengers on the incoming car desire to transfer to the outgoing car, the same as to Grand avenue, both cars should be stopped until passengers can transfer. At all other hours of the day the rules now in force by the company may be enforced. Transfers given to passengers on the outside of the terminal station may be different to those given on the inside." **Held,** that the commission had jurisdiction to make this order.

(a)   Said order on review here is not shown to be unreasonable and unjust.

(Syllabus by the Court.)

*Appeal from the State Corporation Commission.*

Proceeding by Mont R. Powell and others against the Oklahoma Railway Company for violation of an order of the Corporation Commission with reference to transferring passengers. Judgment for plaintiffs, and defendant appeals. Affirmed.

*Shartel, Keaton & Wells* and *Asp, Snyder, Owen & Lybrand,* for appellant.

*Chas. West,* Atty. Gen., and *Chas. L. Moore,* Asst. Atty. Gen., for appellees.

WILLIAMS, J.   This proceeding seeks to review an order of the Corporation Commission, which is in words and figures as follows:

"The commission will issue the following order and should the same be abused by either the railway company or the patrons thereof, or any part thereof work unsatisfactory to the public, the commission will modify the same at any time upon application of either party, with a view of ultimately working out a satisfactory arrangement to all concerned. It is therefore ordered that on all days except Sundays, between the hours of six and eight a. m. and five- thirty and eight p. m. the defendant, the Oklahoma Railway Company, shall give transfers when requested by the passenger and that said transfers should be honored at any point on the line for which they are marked. Between the hours of six and eight a. m. when two cars meet on a parallel track, they shall stop for the transfer of passengers. Example: If a University car going west on Main street between Broadway and the terminal should meet a Capitol Hill or Stock Yards car, both cars shall stop to transfer passengers if they have any. Between six and eight a. m., as one car is entering the terminal from Main street, if at the same time another car is coming out on Main street, and passengers on the incoming car desire to transfer to the outgoing car, the same as to Grand avenue, both cars should be stopped until passengers can transfer. At all other hours of the day the rules now in force by the company may be enforced. Transfers given to passengers on the outside of the terminal station may be different to those given on the inside."

The appellant insists that (1) the commission was without jurisdiction to make said order, and (2) that if it had such jurisdiction the order is unreasonable and unjust.

1. The provision contained in section 18, art. 9, of the Constitution (section 234, Williams' Ann. Const. Okla.), is as follow:

"Provided, however, that nothing in this section shall impair the rights which have heretofore been, or may hereafter be, conferred by law upon the authorities of any city, town, or county to prescribe rules, regulations, or rates of charges to be observed by any public service corporation in connection with any services performed by it under a municipal or county franchise granted by such city, town, or county, so far as such services may be wholly within the limits of the city, town, or county granting the franchise."

On January 30, 1902, the mayor and council of Oklahoma City passed an ordinance (No. 281) entitled:

"An ordinance authorizing the Metropolitan Railway Company, of Oklahoma City, its successors and assigns, to construct and maintain an electric railway system in the streets and alleys of Oklahoma City and regulating the construction, operation and maintenance thereof"

—authorizing said railway company, among other things, to build and construct a system of electric street railways over and along the streets of said city, and defining the conditions of the exercise of the authority therein conferred. On February 8, 1902, the said railway company, in accordance with the requirements of said ordinance, filed with the city clerk of said city its acceptance of the terms and conditions thereof. On June 15, 1904, said railway company sold, conveyed, and assigned its said railway system, together with the franchise rights and privileges existing in its favor by virtue of said ordinance, to the Oklahoma Railway Company, the appellant herein.

Section 6 of the said ordinance provides:

"The mayor and councilmen of said city shall not be deemed by the granting of the privileges contained in this ordinance to have waived or abandoned the right to make any and all needful police regulations with reference to the operation or maintenance of said street car system, and shall at all times have the power to pass ordinances regulating the use of headlights, gongs and fenders and all other needful rules and regulations for the protection of the inhabitants of said city, in connection with the operation of said railway."

At the time said ordinance was passed granting said franchise, said Oklahoma City, being a city of the first class, possessed no corporate authority to pass such ordinance. Such authority was then possessed only by incorporated towns. Section 512, Wilson's Rev. & Ann. St. 1913, subd. 20; *South McAlester-Eufaula Tel. Co. v. State ex rel.*, 25 Okla. 524, 106 Pac. 962.

The Legislature of Oklahoma Territory in 1903 passed an act entitled:

"An act authorizing the organization of corporations for the construction of electric railways and defining the power of such corporations."

Section 3 of said act, which was approved March 16, 1903, provides:

"All licenses or franchises heretofore granted to any street railway company authorizing the construction and operation of an electric street railroad in any city of the first class in the territory of Oklahoma, and which have not become forfeited or lapsed by their terms, are hereby ratified, legalized and confirmed. (Section 3, art. 4, c. 9, p. 141, Sess. Laws 1903).

Section 2 of said act (Sess. Laws 1903, p. 141) also provides:

"Such corporations in addition to the powers exercised by railroad corporations generally, may, with the consent of the authorities of any city or town in the territory of Oklahoma located upon or along its lines, construct system of street railways upon such streets and upon such terms and conditions as may be agreed upon between such corporations and such city or town, and may also accept lighting contracts with such cities or towns, to supply the said cities or the inhabitants thereof, with light or electric current for power or such railways or such corporation may also acquire by purchase or consolidation, plants, franchises, contracts, good will and other property of any existing street railway or lighting company."

It is insisted that section 6 of the ordinance hereinbefore set out has the effect, by virtue of said section 3 of the act of March 16, 1903, of granting such power to the municipality of Oklahoma City. It is not essential to determine whether section 3 of the act of March 16, 1903, in ratifying said franchise, could operate to have such effect by virtue of the ordinance, as we do not construe section 6 as conferring upon the authorities of the city of Oklahoma City the right to prescribe rules, regulations, or charges to be observed by said railway corporation in connection with any services to be performed by it for the patronizing public. Section 6 relates to the municipality's ordinary general power and authority over its streets and highways within its limits for the promotion of the health, safety, morals, and general welfare of its inhabitants. *South McAlester-Eufaula Tel. Co. v. State ex rel., supra;* Dillon on Municipal Corporations (5th Ed.) vol. 1, sec. 237, p. 450; *State ex rel. v. M. & K. Tel. Co.,* 189 Mo. 83, 88 S. W. 41. Such power every municipality may exercise, and if said proviso of said section 18 contemplated such powers on the part of municipalities, then the Corporation Com-

mission could under no state of facts prescribe rules and regulations for street railways in municipalities.

In *South McAlester-Eufaula Tel. Co. v. State ex rel., supra,* this court held that the municipality of Hartshorne, under its ordinary general authority within its limits, for the promotion of the health, safety, and morals and general welfare of its inhabitants, had no right to impose conditions upon the telephone company in consideration for the grant of the use of its streets, unless such authority was expressly granted by the sovereign power. In the same case it was held that the power to regulate the manner of construction of a telephone line did not grant the authority to fix rates by contract, franchise, or ordinance.

We conclude that, at the time of the erection of the state, no right had theretofore been conferred by law upon the authorities of Oklahoma City to prescribe rules and regulations to be observed by said street railway company, as the terms are used in said proviso to section 18, art. 9, *supra.*

(a)   Since the erection of the state, said city has adopted a charter by virtue of the provisions of article 18 of the Constitution. Section 5 of article 1 of the charter authorizes said municipality within its limits and within fifteen miles without to construct, condemn, and purchase, acquire, lease, improve, add to, maintain, and conduct and operate, in whole or in part, a street railway system. Said section contains the following proviso:

"Provided, however, that the power to condemn shall not be exercised for the purpose of acquiring such utilities now existing and operating under franchises granted by the city, except under the terms of said franchises. Provided, further, that the same exemption from the power to condemn may be embodied in any franchise for any other public service utility corporation that may hereafter be submitted to a vote of the people."

Section 7 of article 18 of the Constitution is substantially incorporated in said charter as section 1, art. 8, thereof. Section 2 of the same article of said charter is as follows:

"The board of commissioners shall be vested with the power of adopting all laws and ordinances not inconsistent with the Constitution and laws of this state for the taxation, regulation

and control of all public service and public utility corporations. now or hereafter existing or operating in whole or in part within the city."

Section 7 of article 18 of the Constitution provides:

"No grant, extension, or renewal of any franchise or other use of the streets, alleys, or other public grounds or ways of any municipality, shall divest the state, or any of its subordinate subdivisions, of their control and regulation of such use and enjoyment. Nor shall the power to regulate the charges for public services be surrendered; and no exclusive franchise shall ever be granted."

This is a limitation (not a grant of power) and prevents. the municipality from ever surrendering or contracting away such power when it may be granted to it by the sovereign power. *Thompson et al. v. Rearick, ante,* 124 Pac. 951.

Missouri has substantially the same constitutional provision as this state for framing charters of municipalities. Section 16, art. 9, Const. of Missouri 1875. Paragraphs 1 and 2 of the syllabus in *State ex rel. v. M. & K. Tel. Co.,* 189 Mo. 83, 88 S. W. 41, are as follows:

"Const. Mo. art. 9, sec. 16, provides that any city having a population of more than 100,000 may frame a charter for its own government, 'consistent with and subject to the Constitution and laws of this state,' etc. The so-called 'Enabling Act' of 1887, providing the means for cities to avail themselves of that constitutional privilege, provides (Acts 1887, p. 51, sec. 50; Rev. St. 1899, sec. 6408) that such city shall have exclusive control over its public highways, streets, etc. Section 51 (Rev. St. 1899, sec. 6409) declares that it shall be lawful for any such city in such charter, or by amendment thereof, to provide for regulating and controlling the exercise by any person or corporation of any public franchise or privilege in any of the streets or public places of such city, whether such franchises or privileges. have been granted by said city, or by or under the state or any other authority. Under such act and constitutional provision, Kansas City in 1889 adopted its charter literally embodying therein said two sections. Article 3, sec. 1, of the charter, provides. that the city shall have power by ordinance to regulate the prices to be charged by telephone companies and to compel them and all persons and corporations using, controlling, or managing electric wires for any purpose to put and keep their wires under

ground, and to regulate the manner of doing the same. The 'general welfare' clause of the charter authorizes the city to pass any ordinance that 'may be expedient in maintaining the peace, order, good government, health, and welfare of the city, * * * or that may be necessary and proper for carrying into effect the provisions of this charter.' *Held* that, while the enactment by the city of an ordinance fixing the maximum rate to be charged by telephone companies for telephone service in the city was expressly authorized by the charter, the state had not delegated to the city the power to exercise such authority in framing its charter, and the ordinance was void. (1)

"The regulation of prices to be charged by a corporation intrusted with a franchise of a public utility character is within the sovereign power of the state granting the franchise or suffering it to be exercised within its borders, which power may be conferred on a municipal corporation; but it is not a power appertaining to the government of the city, and does not follow as an incident to a grant of power to frame a charter for a city government." (2)

In the opinion it is said:

"But under that Constitution cities of certain descriptions were authorized to frame their own charters. A charter framed under that clause of the Constitution, within the limits therein contemplated, has a force and effect equal to one granted by an act of the Legislature. But it is not every power that may be essayed to be conferred on the city by such a charter that is of the same force and effect as if it were conferred by an act of the General Assembly, because the Constitution does not confer on the city the right to assume all the powers that the state may exercise within the city limits, but only powers incident to its municipality, yet the Legislature may, if it should see fit, confer on the city powers not necessary or incident to the city government. There are governmental powers, the just exercise of which is essential to the happiness and well-being of the people of a particular city, yet which are not of a character essentially appertaining to the city government. Such powers the state may reserve to be exercised by itself, or it may delegate them to the city, but until so delegated they are reserved. The words in the Constitution, 'may frame a charter for its own government,' mean, 'may frame a charter for the government of itself as a city,' which includes all that is necessary or incident to the government of the municipality, but not all the power that the state has for the protection of the rights and regulation of the duties

of the inhabitants in the city, as between themselves. Nor does, the Constitution confer unlimited power on the city to regulate by its charter all matters that·are strictly local, for there are many matters local to the city, requiring governmental protection, which are foreign to the scope of municipal government. In none of the cases that have been before this court, bringing into question the charters of St. Louis and Kansas City under the Constitution of 1875, have we given to this constitutional provision any broader meaning than above indicated. *St. Louis v. Bell Tel. Co.,* 96 Mo. 623, 10 S. W. 197, 2 L. R. A. 278, 9 Am. St. Rep. 370; *State v. Field,* 99 Mo. 353, 12 S. W. 802; *Kansas City v. Scarritt,* 127 Mo. 646, 29 S. W. 845, 30 S. W. 111; *State ex rel. Subway Co. v. St. Louis,* 145 Mo. 574, 46 S. W. 981, 42 L. R. A. 113; *Kansas City v. Stegmiller,* 151 Mo. 189, 52 S. W. 723; *Young v. Kansas City,* 152 Mo. 662, 54 S. W. 535. The regulation of prices to be charged by a corporation intrusted with a franchise of a public utility character is within the sovereign power of the state that grants the franchise or that suffers it to be exercised within its borders, and that power may be with wisdom and propriety conferred on a municipal corporation; but it is not a power appertaining to the government of the city, and does not follow as an incident to a grant of power to frame a charter for a city government. The authority of Kansas City to insert in its charter the power to regulate the price to be charged for telephone service within the city is not conferred by the constitutional provision above quoted. Is it conferred by what is called the 'Enabling Act' of 1887? The purpose of that act was to enable cities of the class named to avail themselves of that constitutional provision. It is entitled: 'An act providing that any city having a population of more than one hundred thousand inhabitants may frame a charter for its own government and regulating the same.' There is nothing, therefore, in the title that indicates an intention to confer on such cities any power except that conferred by the Constitution. In its grant of power it so closely copies the language of the Constitution that its meaning to keep within the lines there drawn is obvious. There is nothing in the whole act of 54 sections that purports to confer on the city any powers except those appertaining essentially to the government of the city, unless, as is contended by the relator, sections 50 and 51 above quoted confer such powers. Section 50 confers on the city 'exclusive control over its public highways, streets, avenues, alleys and public places,' etc., and section 51 authorizes the city to provide in its charter 'for regulating and controlling the exercise by any per-

son or corporation of any public franchise or privilege in any of the streets or public places of such city, whether such franchises or privileges have been granted by said city, or by or under the state of Missouri, or any other authority.' The exclusive control of its streets as granted in section 50 is an attribute of municipal authority, and could have been adopted in the charter, under the authority of the Constitution, without the express sanction of the General Assembly. The word 'exclusive,' however, in that connection, is not to be given its unlimited meaning, but must be understood as subject to the control of the state whenever the state chooses to assume control. The constitutional grant of power under which the charter is formed says that it must always be subject to the Constitution and laws of the state, which we interpret to mean that, in all matters not appertaining to city government, the charter is subordinate to the will of the General Assembly. The Legislature, in conferring on the city the exclusive control of its streets, meant exclusive control for the purposes of the city government, not to the exclusion of the state in other matters. The General Assembly, except as limited in the Constitution, has jurisdiction to grant franchises to be exercised in the streets of the cities and other public highways in the state, and that jurisdiction has not been surrendered either to cities with charters under the Constitution or to other municipalities. In adopting these two sections (50 and 51) of the so-called 'Enabling Act,' the Legislature had in view the necessity of power in the city to control its streets and other public places, and the power in the state to grant franchises to be exercised by the grantee in the streets and other public places of the city, and it was not difficult to foresee that a clash might occur between the city in its exclusive control of the street, and the private corporation in the exercise of the franchise granted by the state. Therefore, after granting to the city, as it did in section 50, control of its streets, the thought occurred to the lawmakers that there were private corporations organized and to be organized under the laws of this state with express authority to use the streets and other public highways in the exercise of their franchises, and, in order to prevent any clash that might occur between the city in its control of the streets and the private corporation in its use of the same, section 51 was added, which gave the city power to regulate and control the private corporation in its use of the street. Under the power, the city may regulate the planting of poles, wires, etc., or require the wires to be put under ground, or do anything within reason to render the use of the street by the private corporation as little of injury

to the public as may be. But the section does not confer on the city the power to regulate the prices to be charged by the telephone company for its service to the inhabitants of the city."

See, also, *Straw v. Harris*, 54 Ore. 424, 103 Pac. 777; *Kiernan v. City of Portland*, 57 Ore. 454, 111 Pac. 379, 112 Pac. 402, 37 L. R. A. (N. S.) 339.

In *Lackey et al. v. State ex rel. Grant et al.*, 29 Okla. 255, 116 Pac. 913, this court in construing section 3a of article 18 of the Constitution of this state, under which provision the present charter of Oklahoma City was framed, approved the doctrine of the Missouri case in construing the charter provision of the Missouri Constitution.

In *Mitchell v. Carter*, 31 Okla. 592, 122 Pac. 691; *Lackey et al. v. State ex rel. Grant et al.*, *supra*, was followed. In the opinion it is said:

"In *Lackey v. State*, 29 Okla. 255, 116 Pac. 913, this court, in construing said statute, said: 'It is clear that the foregoing statute intends to provide that, wherever a freeholders' charter has been adopted under the provisions of the Constitution, and conflicts with any law of the state relating to municipal matters of cities of the first class, the provisions of such charter shall prevail.' In other words, the effect of said statute was to declare the law as it already existed in the Constitution, merely setting out the same in greater detail than as contained in article 18. In *Lackey v. State*, *supra*, the rule was declared that, whenever any matter fell 'within the domain of municipal government' or related solely to municipal affairs, such provision of a municipal charter, adopted pursuant to the provisions of article 18, superseded the general state laws."

*Mitchell v. Carter*, *supra*, is cited with approval in *Cotteral et al. v. Barker et al.*, 34 Okla. ——, 126 Pac. 211. It follows that any provision contained in said charter, unless the same relates purely to municipal matters, is not within the grant, unless the act of Legislature of May 28, 1908, entitled, "An act to enable all cities containing a population of more than two thousand inhabitants to frame and adopt charters for their own government, and to extend and define their powers," has such effect. Sess. Laws 1908, c. 12, art. 4. Section 4 of said act is as follows:

"When a charter for any city of this state shall have been framed, adopted and approved according to the provisions of this act, any provisions of such charter shall be in conflict with any law or laws relating to cities of the first class in force at the time of the adoption and approval of such charter, the provisions of such charter shall prevail and be in full force, notwithstanding such conflict, and shall operate as a repeal or suspension of such state law or laws to the extent of such conflict; and such state law or laws shall not thereafter be operative in so far as they are in conflict with such charter: Provided, that such charter shall be consistent with and subject to the provisions of the Constitution, and not in conflict with the provisions of the Constitution and laws relating to the exercise of the initiative and referendum, and other general laws of the state not relative to cities of the first class."

All legislative grants of powers to municipal bodies which are "out of the usual range, or which grant franchises, or rights of that nature, or which may result in public burdens, or which in their exercise touch the right to liberty or property, or, as it may be compendiously expressed, any common-law right of the citizen or inhabitant, must be strictly construed." 1 Dillon on Municipal Corporations (5th Ed.) sec. 239, p. 452, and authorities cited in footnotes 1 and 2.

As was said in *Mitchell v. Carter, supra,* said section 4 was merely declaratory of the rights that already existed under the Constitution, elaborating and setting out the same more in detail. It does not appear that it was the intention of the Legislature to grant any greater powers of sovereignty than had already been granted under provisions of article 18 of the Constitution, which is self-executing. *State ex rel. v. Scales, Mayor, et al.,* 21 Okla. 683, 97 Pac. 584; *Stearns, Mayor, et al. v. State ex rel.,* 23 Okla. 462, 100 Pac. 909. In view of said rule of strict construction of corporate powers being applicable to grants of power to municipal bodies which are out of the usual range, we must conclude that Oklahoma City under its charter, adopted by virtue of sections 3a and 3b, art. 18, Const., without further authorization by the Legislature, may not prescribe rules and regulations to be observed and fix rates to be charged by the appellant in

the performance of its duties towards the patronizing public as a public service corporation.

2.   The commission heard the evidence and made the order against the appellant.   The matters under consideration here involve the management of a street railway system and are largely administrative in their nature.   Corporation Commissioners, by experience and study and application, become skilled and proficient in such matters; at least, they are presumed so to be.   There are matters connected with the management and operation of such plants that are very difficult to be brought out or made to appear on the record; hence one of the reasons for incorporating the provision in said section that the action of the commission appealed from shall be regarded as *prima facie* just, reasonable, and correct.   This court has time and again held that such action, when sustained by any evidence, must be overcome or rebutted by facts in the record as weighed and found by this court on review, before it will disturb the same.   See authorities cited under section 240, Williams' Ann. Const. Okla.

The only part of the order about which we have any doubt is that which requires:

"Between the hours of six and eight a. m. when two cars meet on a parallel track, they shall stop for the transfer of passengers.   Example:   If a University car going west on Main street between Broadway and the terminal should meet a Capitol Hill or Stock Yards car, both cars shall stop to transfer passengers if they have any.   *   *   * "

Obviously it is intended by this that the cars are to stop only in the event there are passengers who desire to transfer from one to the other car.   This could be done by signals, and, if after a test it is impractical to stop these cars except at regular stations or stops on application, this part of the order may be modified.

This appeal has been pending in this court for five months, the order not having been superseded; and, had the practical operation under this order shown that it was impractical to stop the cars to transfer from one to another on signals, it could have been brought to the attention of this court by a proper petition to have the cause remanded to have such evidence taken and incorporated in the record.   Such not having been done, it is as-

sumed that the practical operation of the cars in this respect has not brought about any serious inconvenience. As to matters that involve the practical operation of trains and cars, the commissioners, who are brought directly and in intimate contact with such matters in the performance of their duties, are in a far better position to pass on this question than we are, and the commission having made this finding, in view of the presumption that the law makes in its favor, we will not disturb the same.

This order cannot be reasonably construed so as to require stop-over privileges on transfer slips to be allowed. No such question is presented on this record.

TURNER, C. J., and HAYES, KANE, and DUNN, JJ., concur.