## CITY OF TULSA v. SOUTHWESTERN BELL TELEPHONE CO.*

## SOUTHWESTERN BELL TELEPHONE CO. v. CITY OF TULSA.

### Nos. 1113, 1114.

Circuit Court of Appeals, Tenth Circuit.
Jan. 26, 1935.

*Writ of certiorari denied 55 S. Ct. 656, 79 L. Ed. ——.

R. L. Davidson and Neal E. McNeill, both of Tulsa, Okl. (H. O. Bland, W. I. Williams, and Bert E. Johnson, all of Tulsa, Okl., on the briefs), for City of Tulsa.

John H. Cantrell, of Oklahoma City, Okl. (J. R. Spielman and J. A. McCloud, both of Oklahoma City, Okl., and A. J. Biddison, Harry Campbell, Valjean Biddison, and Harry Campbell, Jr., all of Tulsa, Okl., on the briefs), for Southwestern Bell Telephone Co.

Before PHILLIPS, McDERMOTT, and BRATTON, Circuit Judges.

PHILLIPS, Circuit Judge.

The City brought this action against the Southwestern Company. The amended petition set up three alleged causes of action:

In its first cause of action the City alleged that on January 5, 1903, the incorporated town of Tulsa granted a franchise to

the Indian Territory Telephone Company for a term of 20 years; that the Southwestern Company succeeded to the rights of the Territory Company under such franchise; that the franchise expired January 5, 1923; that in 1908 the City, under authority of section 3 (a) of article 18, Oklahoma Constitution, adopted a charter which provided that no streets, alleys, or public highways in the City should ever be used by any person, firm, or corporation for the construction or operation of a telephone system without first obtaining authority therefor under a franchise granted by the Board of Commissioners of the City, with the approval of a majority of the qualified electors of the City; that any person to whom such a franchise should be granted, should pay as compensation for the right or privilege enjoyed, 4% of the gross receipts of the business carried on under such franchise; that on April 12, 1928, the charter was amended so as to provide that such compensation should not be less than 1% nor more than 4% of such gross receipts;

And that after the expiration of the 1903 franchise the Southwestern Company, without having secured an extension thereof or the grant of a new franchise, continued to occupy the streets and alleys of the City; that since January 5, 1923, it has enjoyed the privileges and benefits it would have enjoyed had it obtained an extension of such franchise or the grant of a new one, and the City has suffered the same detriment it would have suffered had such franchise been extended or a new one granted; that during such time the Southwestern Company has received in gross receipts $12,934,442.62 from its local exchange service, and $10,054,851.08 from its long distance service; that 4% of such gross receipts, or $919,571.74, is fair and reasonable compensation for the use of the City's streets and alleys by the Southwestern Company, and that having received the benefit of the use of such streets and alleys and having deprived the City of the compensation it would have received had such franchise been extended or a new one granted, the Southwestern Company is liable to the City for 4% of such gross receipts. The City sought recovery thereof.

In its third cause of action the City set out substantially the same facts, and alleged it had been damaged by the unlawful use of its streets and alleys by the Southwestern Company from January 5, 1923, to June 1, 1932, in the sum of $919,571.74, and sought recovery thereof.

In its second cause of action the City alleged the same principal facts as in the first, and sought a judgment of ouster.

As construed by the City, the first cause of action is for the reasonable value of the use of the streets, whether the occupancy by the Southwestern Company was lawful or unlawful, and the third cause of action is for damages for the alleged wrongful occupancy of the streets by the Southwestern Company.

In its amended answer the Southwestern Company admitted the City is a municipal corporation originally organized under the laws of the Indian Territory, and the adoption and approval of the City's charter.

It denied the validity of the franchise, and denied it or its predecessors had accepted same or done business thereunder.

It alleged it had the right to occupy the streets and alleys by virtue of the approval by the Secretary of Interior of an application for a telephone right of way in Tulsa filed by its predecessor, Pioneer Telephone & Telegraph Company, pursuant to the Act of March 3, 1901 (31 Stat. 1083, § 3, 25 US CA § 319), and by virtue of the provisions of article 9, § 2, Oklahoma Constitution, and section 11976, O. S. 1931, originally enacted in 1890 by Oklahoma Territory and carried into the statute law of Oklahoma by section 2 of the Schedule to the Oklahoma Constitution, and by virtue of easements granted to it by adjoining owners.

It also pleaded estoppel, limitation of action, and a judgment in favor of its predecessor, the Pioneer Company, in an ouster proceeding brought against the latter company on September 14, 1908.

On June 5, 1899, the Town of Tulsa undertook to grant to R. H. Hall a franchise to construct a local telephone exchange and system in Tulsa. On October 10, 1899, the Acting Commissioner of Indian Affairs undertook to give to Hall a permit to establish and operate such exchange and system. Hall constructed and commenced the operation of a local telephone system in Tulsa in 1899.

The Territory Company completed a toll line into Tulsa late in 1902 or early in 1903. It desired to purchase Hall's telephone system, but he declined to sell. The Town of Tulsa wanted the Territory Company to acquire Hall's system in order to afford long

distance communication to the citizens of Tulsa. To induce Hall to sell, the town on January 5, 1903, enacted Ordinance 36, purporting to grant to the Territory Company the right to construct and operate a telephone system in Tulsa. The Territory Company did not construct a telephone system under that ordinance, but on January 16, 1903, purchased the existing system from Hall.

On November 15, 1907, the Territory Company transferred its telephone system in Tulsa to the Pioneer Company. On July 7, 1917, the name of the Pioneer Company was changed to Southwestern Bell Telephone Company, an Oklahoma corporation. On April 16, 1920, the latter company transferred its property to the Southwestern Company, a Missouri corporation, and the defendant here.

Oklahoma was admitted to statehood on November 16, 1907. Tulsa became a city of the first class under the laws of Oklahoma on December 30, 1907.

On July 3, 1908, Tulsa adopted a special charter. It was approved by the governor on January 5, 1909. Such charter undertook to provide that no person, firm, or corporation should use the streets and alleys of the City for the construction or operation of a street railway, telegraph line, telephone system, or other business of a public or quasi public nature without first obtaining authority therefor under a franchise granted by the City. Paragraph 1, § 1, art. 7, Charter, City of Tulsa. Paragraph 5, § 7, art. 2 of the charter, provided that such a person, firm, or corporation should pay as compensation for the use of the streets and alleys not less than 4% of the gross receipts of the business conducted under such a franchise. As amended April 12, 1928, it provided that such compensation should be not less than 1% nor more than 4% of the gross receipts.

The trial court held that section 7, art. 2, of the charter of the City of Tulsa undertakes to impose a burden on interstate commerce and is void, and that the Southwestern Company and its predecessors had acquired the right to occupy the streets of Tulsa under the Act of March 3, 1901, and section 11976, O. S. 1931.

It rejected proffered proof in support of the pleas of limitation and estoppel, and directed a verdict for the Southwestern Company. Judgment was entered accordingly and both parties have appealed.

Franchise Granted by the Town of Tulsa.

Tulsa was first organized as an incorporated town on January 18, 1898, under the laws of Arkansas, by a judgment of the United States Court for the Northern District of Indian Territory. It was adjudged to be a city of the second class on July 28, 1903, by a judgment of the United States Court for the Western District of Indian Territory.

Incorporated towns in the Indian Territory had no power, under the statutes of Arkansas (Mansfield's Digest) in force in Indian Territory, to grant franchises or rights of way to telephone companies. Muskogee Nat. Tel. Co. v. Hall, 4 Ind. Terr. 18, 64 S. W. 600; Id. (C. C. A. 8) 118 F. 382; South McAlester Eufaula Tel. Co. v. State, 25 Okl. 524, 106 P. 962.

In Muskogee Nat. Telephone Co. v. Hall, supra, decided October 4, 1901, it was held that the Town of Tulsa had no authority to grant a telephone franchise, that prior to the Act of March 3, 1901, the Secretary of Interior had no authority to issue a permit to establish and operate a telephone system in Indian Territory, and that the franchise and permit granted to Hall were void.

Ordinance 36 purported to grant to the Territory Company the right to construct and operate a telephone system in Tulsa for 20 years.

Section 2 provided that the Territory Company might enter upon the streets, alleys, and public grounds within the then and future limits of Tulsa for the purpose of erecting and constructing a telephone system and exchange.

Section 4 provided maximum rates.

Section 6 provided that the Territory Company should "begin the building, construction and erection of said telephone system and exchange within ninety (90) days from the passage and publication of this ordinance" and that such system should "be built of the best material and in the most modern manner."

Thus it will be seen that the purported franchise was not for the acquisition and operation of an established system, but for the construction and operation of a new and modern system, and provided the construction thereof should be commenced within 90 days.

The Territory Company did not construct a new and modern system, and never

brought itself within the conditions of the ordinance.

Furthermore, the Town of Tulsa had no power to grant such ordinance. It was so held with respect to an ordinance purporting to have been granted by Hartshorne, a town of the same class and powers as Tulsa, in South McAlester Eufaula Telephone Company v. State, supra.

Moreover, in 1908 Tulsa brought a suit against the Pioneer Company to enjoin it from charging higher rates than those permitted by the ordinance, to cause it to remove its system from the streets, and to oust it from the city. The Pioneer Company interposed a demurrer. A stipulation was entered into that the case should be governed by the Eufaula Case, then pending in the supreme court of Oklahoma. When the decision was rendered in the Eufaula Case holding the town of Hartshorne had no power to grant a telephone franchise, the trial court dismissed the suit brought by Tulsa against the Pioneer Company. This was an adjudication that Ordinance 36 was void and that the Pioneer Company was not bound by the provisions thereof.

The Southwestern Company is the successor in title to and in privity with the Pioneer Company.

We conclude that Ordinance 36 is void, and that the Southwestern Company was not bound thereby.

Rights of Way Under Federal Grant.

Tulsa was platted and laid out as a townsite on lands of the Creek Nation under the provisions of the Original Creek Agreement approved March 3, 1901, and ratified May 25, 1901 (31 Stat. 861).[1] The townsite plat was approved by the Secretary of Interior April 11, 1902.

Prior to the making and approval of the plat Hall had constructed and was operating a local telephone system in Tulsa.

The Act of March 3, 1901, § 3, supra (25 USCA § 319), gave the Secretary of the Interior exclusive authority to grant rights of way for the construction, maintenance, and operation of telephone lines through "lands held by an Indian tribe or nation in * * * Indian Territory * * * or through any lands which" had "been allotted in severalty to any individual Indian under any law or treaty, but which" had "not been conveyed to the allottee with full power of alienation." [2]

Between February 1, 1904, and April 17, 1907, the Secretary and his duly authorized subordinates made repeated demands upon

---

[1] Section 10 of the Original Creek Agreement (31 Stat. 864) in part provides:

"That the Secretary of the Interior is hereby authorized, under rules and regulations to be prescribed by him, to survey, lay out, and plat into town lots, streets, alleys, and parks, the sites of such towns and villages in the Choctaw, Chickasaw, Creek, and Cherokee nations, as may at that time have a population of two hundred or more, in such manner as will best subserve the then present needs and the reasonable prospective growth of such towns."

Sections 10, 14, and 15 (31 Stat. 864, 866) provide for the appraisal, sale, and conveyance of town lots.

Section 23 (31 Stat. 867) in part provides:

"All conveyances shall be approved by the Secretary of the Interior, which shall serve as a relinquishment to the grantee of all the right, title, and interest of the United States in and to the lands embraced in his deed."

Section 12 of the Act of April 26, 1906 (34 Stat. 137, 141) provides that "all municipal corporations in the Indian Territory are hereby authorized to vacate streets and alleys, or parts thereof, and said streets and alleys, when vacated, shall revert to and become the property of the abutting property owners."

[2] 25 USCA § 319 (31 Stat. 1083, § 3, approved March 3, 1901) reads as follows:

"The Secretary of the Interior is authorized and empowered to grant a right of way, in the nature of an easement, for the construction, operation, and maintenance of telephone * * * lines and offices for general telephone * * * business through any Indian reservation, through any lands held by an Indian tribe or nation in the former Indian Territory, through any lands reserved for an Indian agency or Indian school, or for other purpose in connection with the Indian service, or through any lands which have been allotted in severalty to any individual Indian under any law or treaty, but which have not been conveyed to the allottee with full power of alienation, upon the terms and conditions herein expressed. No such lines shall be constructed across Indian lands, as above mentioned, until authority therefor has first been obtained from the Secretary of the Interior, and the maps of definite location of the lines shall be subject to his approval. The compensation to be paid the tribes in their tribal capacity and the individual allottees for such right of way through their lands shall

the Territory Company and the Pioneer Company to comply with the provisions of the Act of March 3, 1901, with respect to their telephone systems constructed on Indian lands, including the Tulsa telephone system, and to pay the annual taxes and general damages due therefor.

On December 20, 1904, the Acting Secretary directed that the Indian Bureau make a report with respect to compliance with the provisions of the Act of March 3, 1901, and the regulations promulgated thereunder, by telephone companies operating in Indian Territory, and set forth the status of each company under the following titles:

1. Maps.

2. Mileage (including number of miles constructed and proposed).

3. Assessment and payment of damages.

4. Payment of taxes.

On April 17, 1907, the Indian Inspector transmitted to the Commissioner of Indian Affairs maps in duplicate of the telephone exchanges operated by the Pioneer Company in towns in Indian Territory, including Tulsa, accompanied by affidavits of the Pioneer Company giving the number of feet of right of way, the number of street crossings, the dates of construction of the several exchanges, and the dates of approval of the town plats of such towns, accompanied by a report in which he stated: That such "exchanges were constructed when the land was common property of the Indian tribes and therefore right of way should have been secured and compensation" paid in accordance with the Act of March 3, 1901; that the Pioneer Company had been advised that "damages and annual" taxes had been assessed against it in stated amounts; that the maps were in proper form and that he recommended their approval.

The Inspector also forwarded a table giving the dates of the construction of the telephone exchanges and the approval of town plats, which showed that the exchange in Tulsa was constructed in 1899 and the township plat of Tulsa was approved April 11, 1902.

There was assessed against the Pioneer Company on account of the telephone system constructed at Tulsa general damages for 31,500 feet of right of way at 10 cents a hundred foot and for 115 street crossings at 10 cents each, and an annual tax of $4.50 on 40,700 feet of right of way for the period from March 3, 1901, to April 11, 1902 (the date of the approval of the townsite plat), making a total assessment of $47.50. This amount the Pioneer Company duly paid.

On June 5, 1907, the Acting Commissioner transmitted such maps, affidavits, and report to the Secretary.

The Acting Commissioner also submitted a report in which he stated that, while the Secretary had no further jurisdiction over such exchanges after the approval of town plats, since these exchanges were constructed prior to the approval of the plat, annual taxes and general damages were due thereon in accordance with the act of March 3, 1901. He further stated that he concurred in the report of the Inspector and recommended "that the maps submitted be approved, subject to the provisions of the Act of March 3, 1901 (31 Stat. 1083), Departmental regulations of March 26, 1901, and the amendment of March 15, 1907, thereto, and subject also to any prior, valid, existing rights and adverse claims."

On June 8, 1907, the Secretary approved the map of the telephone system in the Town of Tulsa submitted by the Pioneer Company, in the following language endorsed on the map:

"Department of the Interior, June 8, 1907. Approved. Subject to the provisions of the Act of March 3, 1901 (31 Stat. L. 1083), Departmental Regulations of March 26, 1901, and amendment of March 15, 1907, thereto, and subject also to any prior, valid and existing rights and adverse claims. James R. Garfield, Secretary."

Counsel for the City contend that the Secretary had no power to grant a right of way to the Territory Company or the Pioneer Company after the approval of the

be determined in such manner as the Secretary of the Interior may direct, and shall be subject to his final approval; and where such lines are not subject to State or Territorial taxation the company or owner of the line shall pay to the Secretary of the Interior, for the use and benefit of the Indians, such annual tax as he may designate, not exceeding $5 for each ten miles of line so constructed and maintained; and all such lines shall be constructed and maintained under such rules and regulations as said Secretary may prescribe: * * * Provided, That incorporated cities and towns into or through which such telephone or telegraphic lines may be constructed shall have the power to regulate the manner of construction therein. * * *"

town plat. They rely on an opinion of Assistant Attorney General Campbell dated June 9, 1906, which held that, upon the approval of the plats of towns in Indian Territory, all the title and interest of the Indians in the lands dedicated for streets and alleys ceased, and "that general damages in the nature of compensation to the Indians" might "not be assessed against such lines constructed after such approval and dedication."

Whether the conclusion reached by the Assistant Attorney General was correct we need not decide. He did not hold that general damages could not be assessed on account of lines constructed, as here, prior to the filing and approval of the plat. And the Department of Interior construed the Act of March 3, 1901, to be applicable to lines constructed prior to the filing of town plats, and proceeded to assess and collect damages therefor.

██ The construction of a statute by a department of the government charged with its execution is entitled to respectful consideration and ought not to be overruled without cogent reasons.[3]

██ We think the construction placed on the act by the Department of Interior was correct. It is well settled that when a parcel of land is taken or injured by the exercise of the power of eminent domain, the owner at the time of the taking or injury, and not his successor in title, is entitled to the compensation.[4] The right to compensation is a personal one and does not run with the land. The telephone system in Tulsa was first constructed by Hall in 1899 under a purported franchise and permit which, while obtained and acted upon in good faith, were without validity. However, Congress remedied the situation in 1901 by passing the Act of March 3, 1901, whereby rights of way could be lawfully acquired for telephone systems on Indian lands in Indian Territory. The taking had occurred prior to the enactment of that statute and continued after its enactment. The right to compensation therefor accrued to the owner of the land at the time the statute became effective. This was long before the filing of the town plat and when the title unquestionably remained in the Indians.

We conclude, therefore, that compensation for the right of way for telephone lines and exchanges in the original town of Tulsa was properly assessed and paid for under the Act of March 3, 1901, that upon the payment title to the right of way inured to the Pioneer Company as of the effective date of that act, and that the grant from the Secretary gave the Southwestern Company and its predecessors the right to maintain its telephone system in the streets and alleys of the town of Tulsa to the extent indicated on the map.

### Rights of Way Under State Law.

We set out the pertinent constitutional and statutory provisions in a foot note.[5]

Section 11976 was originally adopted by the Territory of Oklahoma in 1890. Section 1079, St. 1890. It was amended in 1910, but the amendment is not material here.

By virtue of section 2 of the Schedule, section 11976 went into force in the state of

[3] Whitebird v. Eagle-Picher Lead Co. (C. C. A. 10) 40 F.(2d) 479, 487, 488; United States v. Moore, 95 U. S. 760, 763, 24 L. Ed. 588; La Roque v. United States, 239 U. S. 62, 64, 36 S. Ct. 22, 60 L. Ed. 147; United States v. Jackson, 280 U. S. 183, 193, 50 S. Ct. 143, 74 L. Ed. 361; Westling v. United States (C. C. A. 8) 60 F.(2d) 398, 405.

[4] Kindred v. Union Pacific R. Co., 225 U. S. 582, 596, 597, 32 S. Ct. 780, 56 L. Ed. 1216; Roberts v. Northern Pac. R. Co., 158 U. S. 1, 10, 15 S. Ct. 756, 39 L. Ed. 873; Stone v. City of Waukegan (C. C. A. 7) 205 F. 495, 498; Northern Pac. R. Co. v. Murray (C. C. A. 9) 87 F. 648, 651; King v. Southern R. Co. (C. C. Ga.) 119 F. 1017; Maffet v. Quine (C. C. Or.) 93 F. 347; Croft v. Scotts Bluff Co., 121 Neb. 343, 237 N. W. 149, 150; Russakov v. McCarthy Co., 206 Cal. 682, 275 P. 808, 810; Barnes v. City of Springfield, 268 Mass. 497, 168 N. E. 78, 84; Carroll v. Davis, 128 S. C. 40, 121 S. E. 601, 603.

[5] Sections 2 and 10, art. 9, of the Oklahoma Constitution read as follows:

"Sec. 2. Every railroad, oil pipe, car, express, telephone or telegraph corporation or association organized or authorized to do a transportation or transmission business under the laws of this State for such purpose, shall, each respectively, have the right to construct and operate its line between any points in this State, and as such to connect at the State line with like lines; and every such company shall have the right with its road or line, to intersect, connect with, or cross any railroad or such line."

"Sec. 10. No law shall be passed by the Legislature granting the right to construct and operate a *street railroad within any city, town, or village, or upon any public highway, without first acquiring the con-*

Oklahoma on the advent of statehood, if not repugnant to the Constitution and not locally inapplicable.

It is urged that section 11976 is repugnant to section 32 of article 2 of the Oklahoma Constitution, which in part reads as follows: "Perpetuities and monopolies are contrary to the genius of a free government, and shall never be allowed. * * *"

Chapter 102, Sess. Laws Okl. 1925, was an act relating to the business of furnishing power, light, heat, gas, electricity, and water in cities and towns. It authorized the surrender of municipal franchises in exchange for revocable permits.

In City of Okmulgee v. Okmulgee Gas Co., 140 Okl. 88, 282 P. 640, 646, 651, the court said:

"Any act of the Legislature which provides for issuing a license, revocable permit, indeterminate permit, or other instrument in the nature of a franchise, which is not limited as to its time of existence, violates section 32 of article 2 of our Constitution."

This case was followed in Oklahoma Nat. Gas Corp. v. State, 141 Okl. 80, 284 P. 40, City of Cushing v. Consolidated Gas Utilities Co., 141 Okl. 82, 284 P. 38, and In re Okmulgee Gas Co., 141 Okl. 98, 284 P. 70.

In Hawks v. Hamill, 288 U. S. 52, 53 S. Ct. 240, 77 L. Ed. 610, the court held that section 32 was applicable to a perpetual franchise to operate a toll bridge.

A franchise is a special privilege conferred by government upon individuals, and which does not belong to the citizens of a country, generally, of common right. Griffin v. Oklahoma Nat. Gas Corp. (C. C. A. 10) 37 F.(2d) 545, 547.

Grants of the right or privilege to use public streets for the purpose of maintaining and operating railroads, electric light and power lines, systems of waterworks, gas pipe lines, telegraph and telephone lines, and the like are special franchises.[6]

It will be noted however that section 2 of article 9 expressly gives to a telephone company "the right to construct and operate its lines between any points in this state," without limit as to duration.

In Police Jury of Jackson Parish, La., v. Tremont & G. R. Co., 136 La. 784, 67 So. 829, 830, the court said:

"Article 271 of the Constitution of 1898 confers upon 'any railroad corporation, * * * the right to construct and operate a railroad between any points within the state.' * * *

"The right to build a railway across a highway, though not expressly granted, results from a necessary implication, since otherwise the grant contained in the Constitution of the right to construct and operate a railroad between any points within the state, would have to be abandoned."

sent of the local authorities having control of the street or highway proposed to be occupied by such street railroad." (Italics ours.)

Section 11976, O. S. 1931, reads as follows:

"There is hereby granted to the owners of any telegraph or telephone lines operated in this State, the right of way over lands and real property in this State, and the right to use public grounds, streets, alleys and highways in this State, subject to control of the proper municipal authorities as to what grounds, streets, alleys or highways said lines shall run over or across, and the place the poles to support the wires are located; also the right to condemn and cross over or under, or build their lines along any railroad property or right of way, subject to the necessary use of such property or right of way by the railroad company; the right of way over real property granted in this section may be acquired in the same manner and by like proceedings as provided for railroad corporations."

Section 2 of the Schedule to the Oklahoma Constitution provides:

"All laws in force in the Territory of Oklahoma at the time of the admission of the State into the Union, which are not repugnant to this Constitution, and which are not locally inapplicable, shall be extended to and remain in force in the State of Oklahoma until they expire by their own limitation or are altered or repealed by law."

[6] Griffin v. Oklahoma Nat. Gas Corp. (C. C. A. 10) 37 F.(2d) 545, 548; New Orleans Gaslight Co. v. Louisiana Light & Heat Producing & Mfg. Co., 115 U. S. 650, 659, 6 S. Ct. 252, 29 L. Ed. 516; Western Union Tel. Co. v. Hopkins, 160 Cal. 106, 116 P. 557, 562; People v. State Board of Tax Com'rs, 224 N. Y. 167, 120 N. E. 192, 193; Beekman v. Third Ave. R. Co., 153 N. Y. 144, 47 N. E. 277, 278; Purnell v. McLane, 98 Md. 589, 56 A. 830, 831; State ex rel. City of Billings v. Billings Gas Co., 55 Mont. 102, 173 P. 799, 800; Jersey City Gas Co. v. Dwight, 29 N. J. Eq. 242, 249; Wheat v. City Council of Alexandria, 88 Va. 742, 14 S. E. 672, 673.

■ It is a well-settled rule of construction that where there is, in an act or Constitution, a specific provision relating to a particular subject, such provision will govern in respect to that subject as against general provisions in the act or Constitution, although the latter standing alone would be broad enough to include the subject to which the more particular provision relates.[7]

■ It is also a rule of construction that general and specific provisions in apparent contradiction may subsist together—the specific qualifying and constituting exceptions to the general.[8]

■ Assuming that a grant for telephone lines over public streets, alleys, and highways of the state in perpetuity would otherwise fall within the provisions of section 32, art. 2, we believe that section 2 of article 9, by specifically granting the right to construct and operate telephone lines between any points in the state without limit as to duration, excepts such grants from the provisions of section 32. If this is the effect of section 2 of article 9, then section 11976, which merely complements and carries out the general spirit and purpose of section 2 of article 9, is not within the inhibition of section 32, art. 2.

Furthermore, section 11976 since statehood has been carried into every revision and compilation of the laws of Oklahoma, and was re-enacted in 1910, Okl. Sess. Laws 1910–11, p. 70, c. 39. The legislature must not have thought it contravened section 32, else it would not have re-enacted it. The administrative authorities of the state apparently did not think it unconstitutional, or they would not have permitted rights to be exercised thereunder since statehood without challenge.

■ Where a statute has been long acquiesced in by the public and treated as valid by the various departments of government, the ordinary presumption of constitutionality is greatly strengthened.[9]

We conclude that section 11976 should not be declared repugnant to section 32, art. 2.

It follows that since statehood the Southwestern Company and its predecessors in title have had the right to construct their telephone lines and system in the public streets and alleys of Tulsa, "subject to control of the proper municipal authorities as to what grounds, streets, alleys or highways said lines" should "run over or across, and the place the poles to support the wires" should be "located."

May the City charge for such occupancy?

In Byars v. State, 2 Okl. Cr. 481, 102 P. 804, 812, Ann. Cas. 1912A, 765, it was held that "the Constitution of Oklahoma expressly reserves to the state control over all public highways, including the roads, streets, and alleys of its municipalities." In Coleman v. Frame, 26 Okl. 193, 109 P. 928, 930,

---

[7] Bailey v. Allan E. Walker, Inc., 55 App. D. C. 74, 2 F.(2d) 123, 125; Swiss Nat. Ins. Co. v. Miller, 53 App. D. C. 173, 289 F. 571, 574; United States v. Zenith Radio Corp. (D. C. Ill.) 12 F.(2d) 614, 618; United States v. Mattio (C. C. A. 9) 17 F.(2d) 879, 880; In re Rouse, Hazard & Co. (C. C. A. 7) 91 F. 96, 101; United States v. Jackson (C. C. A. 9) 143 F. 783, 787; Pillsbury Flour Mills Co. v. Great Northern R. Co. (C. C. A. 8) 25 F.(2d) 66, 68, 69.

[8] Pillsbury Flour Mills Co. v. Great Northern R. Co., supra; Sutherland on Statutory Construction (2d Ed.) § 348; Townsend v. Little, 109 U. S. 504, 512, 3 S. Ct. 357, 27 L. Ed. 1012; Kepner v. United States, 195 U. S. 100, 125, 24 S. Ct. 797, 49 L. Ed. 114, 1 Ann. Cas. 655; Anchor Oil Co. v. Gray (C. C. A. 8) 257 F. 277, 283.

[9] De Soto Motor Corp. v. Stewart (C. C. A. 10) 62 F.(2d) 914, 915, and cases there cited; Olander v. Hollowell, 193 Iowa, 979, 188 N. W. 667, 669; State ex rel. Hennepin County v. Erickson, 160 Minn. 510, 200 N. W. 813, 814; McInnes v. McKay, 127 Me. 110, 141 A. 699, 702; State v. Rocke, 91 W. Va. 423, 113 S. E. 647, 650; Kelley v. Meyers, 124 Or. 322, 263 P. 903, 905, 56 A. L. R. 661; Corporation of Sisters of Mercy v. Lane County, 123 Or. 144, 261 P. 694, 700; City of Astoria v. Cornelius, 119 Or. 264, 240 P. 233, 236; Willard v. Glenn-Colusa Irr. Dist., 201 Cal. 726, 258 P. 959, 966; Reeves v. State, 36 Okl. Cr. 186, 253 P. 510, 511.

In the case last cited, the court said:

"In testing the constitutionality of an act of the Legislature, every presumption in favor of the constitutionality must be indulged by the court, and an act will be upheld unless its conflict with the Constitution is clear and certain. * * *

"This rule is particularly applicable and the presumption is especially strong where there has been a long acquiescence and the provisions challenged have been treated as valid, or where great injury would result from declaring a statute void."

the court said: "Whilst it is true that streets are directly under the charge and control of municipal authorities, this control is subject to the paramount authority of the state."

██ Section 2 of article 9 grants the right to construct and operate railroad, oil pipe, telegraph, and telephone lines "between any points in" the state. Section 10, art. 9, provides that "no law shall be passed by the Legislature granting the right to construct and operate a street railroad within any city, town, or village, or upon any public highway, without first acquiring the consent of the local authorities having control of the street or highway proposed to be occupied by such street railroad."

Applying the doctrine of expressio unius est exclusio alterius, it follows that the legislature may grant the right to telephone companies to occupy the public streets and highways without the consent of local municipal authorities. This the legislature had done, as we have seen, by the provisions of section 11976.

Section 11976 was borrowed from South Dakota, the original Oklahoma Territory statute and the South Dakota statute being substantially alike. However, the South Dakota statute is limited by section 3 of article 10 of the Constitution of that state, which provides: "No street passenger railway or telegraph or telephone line shall be constructed within the limits of any village, town or city without the consent of its local authorities." [10]

It is significant that Oklahoma omitted both from its applicable Constitution and statutory provisions, the requirement that the consent of local authorities should be obtained, except in the case of street railways. State ex rel. Rocky Mt. Bell Tel. Co. v. Mayor of City of Red Lodge, 30 Mont. 338, 76 P. 758.

██ Legislative grants to municipal corporations are to be strictly construed, and any reasonable doubt is to be resolved against the grant.[11] And the enumeration of specific powers operates to exclude those not enumerated.[12]

Section 11976 gives to municipalities the power to adopt reasonable regulations as to what streets, alleys, or public grounds within their limits shall be occupied by telephone lines, and where the poles and wires shall be located. By enumerating such specific powers, it impliedly withholds from municipalities all other powers with respect to telephone rights of way.

---

[10] In Missouri River Tel. Co. v. City of Mitchell, 22 S. D. 191, 116 N. W. 67, 69, the court said: "It [the telephone company] is a corporation created by and existing under state laws. The nature and extent of its rights depend on the will of the Legislature, limited, so far as this case is concerned, only by the provision of the state Constitution that no telephone line shall be constructed within the limits of any city without the consent of its local authorities. Const. S. D. art. 10, § 3. While this provision limits the power of the state Legislature, it grants no legislative power to the municipal council. Though the Legislature may not authorize the construction of a telephone line in any city without the latter's consent, the city has no power to impose any conditions or establish any regulations other than those permitted by the Legislature. Adding to the statute the constitutional provision regarding consent, the law applicable to the issue here involved is expressed in the following language: 'There is hereby granted to the owners of any telegraph or telephone lines operated in this state the right of way over lands and real property belonging to the state, and the right to use public grounds, streets, alleys and highways in this state, subject to control of the proper municipal authorities as to what grounds, streets, alleys or highways said lines shall run over or across, and the place the poles to support the wires are located. The right of way over real property granted in this act may be acquired in the same manner and by like proceedings as provided for railroad corporations:' Provided, however, that no telephone line shall be constructed within the limits of any city without the consent of its local authorities. Rev. Civ. Code, § 554; Const. S. D. art. 10, § 3."

[11] Y. & Y. Cab Service v. City of Oklahoma City, 167 Okl. 134, 28 P.(2d) 551, 552; Grantham v. City of Chickasha, 156 Okl. 56, 9 P.(2d) 747; People v. Village of Oak Park, 268 Ill. 256, 109 N. E. 11, 13.

[12] People v. Village of Oak Park, supra; Van Eaton v. Town of Sidney, 211 Iowa, 986, 231 N. W. 475, 477, 71 A. L. R. 820; People ex rel. Friend v. Chicago, 261 Ill. 16, 103 N. E. 609, 49 L. R. A. (N. S.) 438, Ann. Cas. 1915A, 292; Barnard & Miller v. Chicago, 316 Ill. 519, 147 N. E. 384, 38 A. L. R. 1533; Interstate Power Co. of Nebr. v. City of Ainsworth, 125 Neb. 419, 250 N. W. 649, 650; Potson v. City of Chicago, 304 Ill. 222, 136 N. E. 594, 596; Mayor of Nashville v. Ray, 19 Wall. 468, 475, 22 L. Ed. 164.

Section 3 (a), art. 18, Oklahoma Constitution, in part provides: "Any city containing a population of more than two thousand inhabitants may frame a charter for its own government, consistent with and subject to the Constitution and laws of this State."

City charter provisions will prevail over legislative enactments only when the former relate to matters strictly local or municipal in character. Ramsey v. Leeper, 168 Okl. 43, 31 P.(2d) 852, 856; Fossett v. State, 34 Okl. Cr. 106, 245 P. 668; Baughman v. Weicker, 136 Okl. 33, 276 P. 208, 211.

Charter provisions do not supersede legislative enactments of general concern in which the state has sovereign interest; and where a charter provision conflicts with the general law of the state, the latter will control. City of Sapulpa v. Land, 101 Okl. 22, 223 P. 640, 646, 35 A. L. R. 872; Walton v. Donnelly, 83 Okl. 233, 201 P. 367; Fossett v. State, supra; Ex parte Shaw, 53 Okl. 654, 157 P. 900.

It therefore becomes necessary to determine whether the maintenance and operation of a telephone system is a matter of purely local or municipal interest, or one of general statewide concern.

The telephone system at Tulsa affords means of communication not only between residents of Tulsa, but between them and residents of the state, the United States, and foreign countries. The evidence shows that a telephone in Tulsa can be directly connected with 216,776 telephones in Oklahoma, and with 17,461,000 telephones in the United States. The maintenance of the system for telephone communication at Tulsa manifestly is a matter of state-wide concern, which should be controlled by state legislation rather than by local ordinances. That this is the established public policy of Oklahoma is indicated, we think, by the provisions of section 2 of article 9, and section 11976, which undertake to provide, not merely for the operation of telephone systems locally but throughout the state, and for connections with lines in bordering states. City of Texarkana v. Southwestern Teleg. & Tel. Co., 48 Tex. Civ. App. 16, 106 S. W. 915.

Sections 74 and 78, chap. 23, Gen. Stat. Kan. 1868, sections 17—1901 and 17—1906, Kan. Rev. St. 1923, conferred upon telegraph companies the right to place their poles, wires and other fixtures under, upon, and across the public roads and streets. The same rights were conferred upon telephone companies by chapter 104, § 1, Laws Kan. 1885, and chapter 140, § 3, Laws Kan. 1907, § 17—1902, Kan. Rev. St. 1923. It was held in New Hope Tel. Co. v. City of Concordia, 81 Kan. 514, 106 P. 35, that the right to build a telephone line on and over streets and highways is directly granted by the state statutes, and that the power of cities with respect thereto is limited to reasonable police regulations defining where and in what manner a telephone company shall erect and maintain its lines.[13]

Under statutes similar to section 11976, it has been held in a number of cases that municipalities may not charge compensation for the use of their streets by a telephone or telegraph company.[14]

In Wisconsin Telephone Co. v. Oshkosh, the court said: "The pecuniary exaction here was merely for doing what the legislature had expressly authorized to be done. The mere exaction of money for revenue only for such authorized act was not among the police powers of the city."

---

[13] See, also, Michigan Tel. Co. v. City of Benton Harbor, 121 Mich. 512, 80 N. W. 386, 47 L. R. A. 104; Wisconsin Tel. Co. v. City of Oshkosh, 62 Wis. 32, 21 N. W. 828, 832; City of Duluth v. Duluth Tel. Co., 84 Minn. 486, 87 N. W. 1127; Northwestern Tel. Ex. Co. v. City of Minneapolis, 81 Minn. 140, 83 N. W. 527, 86 N. W. 69, 53 L. R. A. 175; Village of Carthage v. Central New York T. & T. Co., 185 N. Y. 448, 78 N. E. 165, 113 Am. St. Rep. 932; City of Rochester v. Bell Tel. Co., 52 App. Div. 6, 64 N. Y. S. 804; City of Brownwood v. Brown T. & T. Co. (Tex. Civ. App.) 152 S. W. 709; Id., 106 Tex. 114, 157 S. W. 1163; City of Wichita v. Old Colony T. Co. (C. C. A. 8) 132 F. 641; Iowa Tel. Co. v. City of Keokuk (D. C. Iowa) 226 F. 82, 97–99.

[14] Wisconsin Tel. Co. v. Oshkosh, 62 Wis. 32, 21 N. W. 828; Inyo County v. Hess, 53 Cal. App. 415, 200 P. 373; Hodges v. Western Union Tel. Co., 72 Miss. 910, 18 So. 84, 29 L. R. A. 770; City of Des Moines v. Iowa Tel. Co., 181 Iowa, 1282, 162 N. W. 323, 325–331; City of Pella v. Fowler, 215 Iowa, 90, 244 N. W. 734, 738; People's Home Tel. Co. v. City of Gainesville (Tex. Civ. App.) 141 S. W. 1044, 1046; American Dist. Tel. Co. v. City of New York, 213 App. Div. 578, 211 N. Y. S. 262; Id., 243 N. Y. 565, 154 N. E. 607; Farmer & Getz v. Columbiana County Tel. Co., 72 Ohio St. 526, 74 N. E. 1078; Barhite v. Home Tel. Co., 50 App. Div. 25, 63 N. Y. S. 659, 664. See, also, Western Union Tel. Co. v. Hopkins, 160 Cal. 106, 116 P. 557.

In Iowa as in Oklahoma, the right to regulate and control public highways, streets, and alleys within municipalities, is not granted to such municipalities but reserved to the state. In City of Des Moines v. Iowa Telephone Co., supra, the court in a well considered opinion held that a municipality had no power to charge for the use of its streets by a telephone company, and distinguished the line of cases relied upon by the City here dealing with situations where the control of highways and streets within municipalities had been vested in such municipalities.

In a number of the cases relied upon by counsel for the City, the right of the municipality to charge compensation for the use of its streets by a public utility was not involved. Where it was involved, the cases differ in material particulars from the instant case.

In City of Springfield v. Inter-State I. T. & T. Co., 279 Ill. 324, 116 N. E. 631, the power of the municipalities to collect rentals for the use of streets by telephone companies was not challenged.

In an earlier case not cited by counsel for the City, City of Springfield v. Postal Telegraph-Cable Co., 253 Ill. 346, 97 N. E. 672, 674, the court said: "The law has long been settled in this state that any city which has the fee, under the power to control its streets, granted by the cities and villages act, may allow any use of them that is not inconsistent with public objects for which they are held. * * * The municipalities in this state may regulate such use and fix a reasonable compensation to be paid for the same."

In City of Memphis v. Postal Telegraph Cable Co. (C. C. A. 6) 145 F. 602, 604, the court said that by the act of the legislature of 1879 "the city of Memphis is given power '* * * to have and exercise entire control over all streets and other public property of the taxing district.' "

In each of the two cases last adverted to, the legislature had delegated to the city full control over its streets. In Oklahoma the power of a municipality to regulate the use of its streets by telephone companies is defined and limited by the legislative act granting the right of way; and control of streets and alleys in cities is reserved to the state by the Constitution. Byars v. State, 2 Okl. Cr. 481, 102 P. 804, 812, Ann. Cas. 1912A, 765.

The Maryland statute, construed in Postal Telegraph Cable Co. v. State Roads Commission, 127 Md. 256, 96 A. 439, 443, and Chesapeake & P. Tel. Co. v. State Roads Commission, 134 Md. 1, 106 A. 257, differs materially from section 11976 in that the Maryland statute simply provides that telegraph and telephone companies may "construct their lines as therein stated 'without their being deemed a public nuisance or subject to be abated by any private party.' "

In City and County of Denver v. Stenger (C. C. A. 8) 295 F. 809, 814, the court said: "It seems unchallenged that, at all times here material, the appellant possessed the power to deny the privilege of special use of its streets or to grant such under terms and compensations agreeable to it."

In City of Hartford v. Connecticut Co., 107 Conn. 312, 140 A. 734, the charter of the company granted by the state authorized the company to construct extensions of its lines of railroad, as common convenience might require, over highways in Hartford, provided it first obtained the consent of the common council of Hartford so to do. It was held that, since the city could wholly withhold its consent, it could give it on condition that the company pay for the use of its highways.

In City of Mitchell v. Dakota Central Tel. Co., 25 S. D. 409, 127 N. W. 582, 584, the court, after quoting the state statute granting rights of way to telephone companies, said: "The latter law does not, in our opinion, have the effect of repealing subdivisions 9, 10, and 17 of section 1229, Rev. Pol. Code, which confers upon cities the right to control and manage its streets and alleys. Both Codes, having been passed at the same time, must be construed together, and these sections will also be construed with reference to the state Constitution known as section 3 of article 10, which is hereinbefore quoted. These sections construed together would seem (1) to give the city exclusive right to control its streets and alleys, and (2) the Constitution prohibits the state from passing any law granting to an individual or corporation the right to construct a telephone system or a street railway unless consented to by the municipality. * * * If section 554 of the Civil Code was given the effect claimed by the respondent, it would clearly be in conflict with section 3 of article 10 of the state Constitution."

Here again the city, having power to wholly withhold its consent, could give it conditionally. The Oklahoma Constitution, as we have heretofore pointed out, gives municipalities power to withhold their con-

sent only with respect to street railroads. Section 10, art. 9, supra.

In City of St. Louis v. Western Union Tel. Co., 148 U. S. 92, 100, 13 S. Ct. 485, 488, 37 L. Ed. 380, the court said: "It is a misconception, however, to suppose that the franchise or privilege granted by the act of 1866 [14 Stat. 221] carries with it the unrestricted right to appropriate the public property of a state. It is like any other franchise, to be exercised in subordination to public as to private rights. While a grant from one government may supersede and abridge franchises and rights held at the will of its grantor, it cannot abridge any property rights of a public character created by the authority of another sovereignty."

In the same case on rehearing, 149 U. S. 465, 470, 13 S. Ct. 990, 992, 37 L. Ed. 810, the court said: "Unless, therefore, the telegraph company has some superior right which excludes it from subjection to this control on the part of the city over the streets, it would seem that the power to require payment of some reasonable sum for the exclusive use of a portion of the streets was within the grant of power to regulate the use. That the company gets no such right from the general government is shown by the opinion heretofore delivered, nor has it any such from the state. The law in force in Missouri from 1866 gives certain rights in streets to 'companies organized under the provisions of this article.' Of course, the defendant, a corporation organized under the laws of the state of New York, can claim no benefit of this. It is true that, prior to that time, and by the act of November 17, 1855 (2 Rev. St. Mo. 1855, p. 1520), the right was given to every telegraph corporation to construct its lines along the highways and public roads; but that was superseded by the legislation of 1866; and when in force it was only a permission, a license, which might be revoked at any time."

Thus it will be seen that the Western Union had no superior right granted by the state, as in the instant case, and that the title and right to control the use of its streets were in the municipality.

Subdivision 20, § 512, Wilson's Rev. & Ann. St. Okl. 1903 (St. Okl. 1890, chap. 16, § 22 [sec. 686]), relied on by counsel for the City, gives to incorporated towns, but not to cities, the power to grant franchises. Tulsa became a city of the first class on December 30, 1907. In Oklahoma R. Co. v. Powell, 33 Okl. 737, 127 P. 1080, 1081, the court said: "At the time [January 30, 1902] said ordinance was passed granting said franchise, said Oklahoma city, being a city of the first class, possessed no corporate authority to pass such ordinance. Such authority was then possessed only by incorporated towns. Section 512, Wilson's Rev. & Anno. Stats. of Oklahoma, subd. 20."

■ Furthermore, the power granted thereby to towns is limited, we think, by the provisions of section 11976. Kansas has two statutes which are substantially the same as section 512 and section 11976.

Sections 74 and 78, chap. 23, Kan. Gen. Stat. 1868, read as follows:

"Sec. 74. Corporations created for the purpose of constructing and maintaining magnetic telegraph lines, are authorized to set their poles, piers, abutments, wires, and other fixtures, along, upon, and across any of the public roads, streets, and waters of this state, in such manner as not to incommode the public in the use of such roads, streets, and waters.

"Sec. 78. The council of any city, or trustees of any incorporated town or village through which the line of any telegraph corporation is to pass, may, by ordinance or otherwise, specify where the posts, piers or abutments shall be located, the kind of posts that shall be used, the height at which the wires shall be run, and such company shall be governed by the regulation thus prescribed; and after the erection of said telegraph lines, the council of any city, or the trustees of any incorporated town or village, shall have power to direct any alteration in the location or erection of said posts, piers or abutments, and also in the height at which the wires shall run, having first given such company, or its agents, opportunity to be heard in regard to such alteration."

An act known as the City Charter Act, Sess. Laws Kan. 1881, p. 79, granted cities power "to grant the right of way for the erection of telegraph or telephone posts and wires along and upon any of the streets, alleys or ways of the city, and change, modify and regulate the same."

In City of Wichita v. Mo. & K. Tel. Co., 70 Kan. 441, 78 P. 886, and City of Wichita v. Old Colony Trust Co. (C. C. A. 8) 132 F. 641, it was held that the City Charter Act and sections 74 and 78 must be reconciled, and that the Charter Act merely gave the city authority to regulate the place and manner of constructing telephone lines and structures in the city streets and alleys.

356

■ The Constitution of Oklahoma has reserved to the state control over highways, streets, and alleys within the corporate limits of municipalities; under it the legislature may grant a right of way to a telephone company to construct and operate its lines within a municipality without the consent of such municipality; the legislature has granted such right by section 11976 without compensation, and has defined the powers of municipalities with respect to telephone rights of way; neither the state nor any of its municipalities, except Tulsa, has undertaken to exact compensation for the use of its streets and highways by telephone companies; the construction and operation of telephone systems within municipalities are matters of state-wide concern. These considerations and the adjudicated cases lead us to conclude that a municipality may not exact compensation from a telephone company for the use of its streets.

### Private Grants.

Section 6141, O. S. 1931, provides for the making, certification, acknowledgment, and recording of a plat of a town, addition, or subdivision of out lots by the proprietor thereof, and prescribes that such plat shall be deemed a sufficient conveyance to vest the fee simple title to lands granted or donated to the public or to any individual, or corporation, insofar as such lands are marked or noted on the plat, and "shall be considered to all intents and purposes a general warranty against such donor or donors, their heirs or representatives, to said donee or donees, grantee or grantees, for his, her or their use for the uses and purposes therein named, expressed and intended, and no other use and purpose whatever"; and that "the land intended to be used for the streets, alleys, ways, commons or other public uses in any town or city or addition thereto shall be held in the corporate name thereof in trust to and for the use and purposes set forth and expressed or intended."

It will be noted that under the statute grants may be made to individuals and corporations.

Of a total of 527 additions to the City of Tulsa, all but 29 of such additions were dedicated and annexed to the City subsequently to November 16, 1907, statehood day. Section 6141 was placed in force in that part of the new state of Oklahoma, which was Indian Territory, by the Constitution on November 16, 1907. The deeds of dedication of 83 of those additions contained express dedication of rights of way for telephone poles and wires in the streets and alleys thereof.

It was the practice of the Southwestern Company and its predecessors to extend their lines and facilities into such additions before annexation. With respect to lines constructed and maintained in such additions subsequently to statehood and prior to annexation, it seems clear the City may not exact compensation for the use of such streets and alleys.

### Res Judicata.

■ On September 14, 1908, the City brought a suit against the Pioneer Company to oust it from doing business in the City, and to compel it to remove its telephone system from the public streets, alleys, and highways of the City. Immediately thereafter the City was notified by the Pioneer Company that it asserted Ordinance 36 was void ab initio, and did not claim the right to occupy the streets and alleys of Tulsa thereunder, but claimed such right by virtue of the approval of its application for right of way by the Secretary of Interior and the provisions of section 11976.

The Pioneer Company demurred to the petition on the ground that it did not state facts sufficient to constitute a cause of action. The state court sustained the demurrer. The City refused to plead further. The state court entered judgment dismissing the cause with prejudice. The Southwestern Company has duly pleaded and proved such judgment as a bar under the doctrine of res judicata.

All the grounds for ouster now asserted, except the alleged nonpayment of rentals, existed at the time the state proceeding was pending. Ordinance 36 was void. The Pioneer Company then claimed the right to occupy the streets and alleys of Tulsa by virtue of the approval of its application for right of way by the Secretary and the provisions of section 11976.

In Vinson v. Graham (C. C. A. 10) 44 F.(2d) 772, 778, this court said:

"A valid judgment on the merits, rendered by a court of competent jurisdiction in a former suit between the same parties or their privies, operates, in a subsequent suit on the same cause of action, as an estoppel not only as to every matter which was offered and received to sustain or defeat the claim, but as to every other admissible matter which might with propriety have been offered for that purpose. * * *

"The national courts are committed to the doctrine that a judgment or decree upon the merits concludes the parties and their privies as to all the media concludendi or grounds for asserting the right known when the suit was brought. * * *

"A party seeking to enforce a cause of action must present to the court, either by pleading or proof or both, all the grounds upon which such cause of action is predicated. He is not at liberty to split up his demand and prosecute it by piecemeal or to present a part of the grounds upon which such cause of action is founded and leave the rest to be presented in a subsequent suit if the first fails."

The City is precluded from asserting, in support of its second cause of action, any ground except the alleged nonpayment of rentals.

### Limitation, Estoppel, and Laches.

Since 1908 the Pioneer Company and its successors the Southwestern Company have at all times denied the validity of Ordinance 36 and asserted their right to occupy the streets and alleys of Tulsa, by virtue of the approval of the Pioneer Company's application for right of way by the Secretary of Interior and the provisions of section 11976.

The alleged invalidity of the federal grant and the unconstitutionality of section 11976 were not asserted in the ouster suit brought by the City in 1908. Although that suit continued to pend after the approval of the City's charter on January 5, 1909, the City did not assert therein the right to collect compensation for the use of its streets and alleys.

In 1919 the city attorney informally discussed with a representative of the Pioneer Company the right of the latter to maintain its telephone system in the streets and alleys of Tulsa, and the Pioneer Company reasserted its claim to rights of way and denied any liability to the City for compensation. Like informal discussions were had in 1921 and 1929. However, the City took no positive action to assert its claim to compensation under its charter provisions until this action was commenced on May 4, 1931. In the meantime the Pioneer Company and the Southwestern Company had expended annually large sums of money in the improvement and extension of its telephone system in Tulsa.

Furthermore, between 1910 and the date the instant suit was brought, the City did many acts which tacitly admitted that the occupancy of its streets and alleys by the Pioneer Company and the Southwestern Company was lawful.

In 1910 the City passed a resolution authorizing the Pioneer Company to install a system of underground conduits, with manholes and connections, on the condition that it reserve a duct therein for the exclusive use of the City. Thereafter the City continued to require the Pioneer Company and the Southwestern Company to reserve space for it in all of the conduits constructed by them. The cost of such reserved space was $117,522.12. The locations of proposed conduits were always approved by the City, and it issued to the Pioneer Company and the Southwestern Company permits to cut the pavement to install same, and charged the customary fee therefor.

During such period many hearings were had before the Corporation Commission with respect to telephone service and rates in Tulsa, in which the City participated and recognized the right of the Pioneer Company and the Southwestern Company to maintain and operate a telephone system in Tulsa. At none of the hearings was the right to compensation for the use of the streets and alleys asserted, nor was any charge therefor considered as a part of the operating expenses in fixing rates.

Were the Southwestern Company required to pay rental for past years here sought to be recovered, it could not include such payments in operating expenses to be considered in fixing rates for the future, and could recover no part thereof through future rates. Georgia Ry. & Power Co. v. Railroad Commission, 262 U. S. 625, 632, 43 S. Ct. 680, 67 L. Ed. 1144; Galveston Elec. Co. v. Galveston, 258 U. S. 388, 42 S. Ct. 351, 66 L. Ed. 678; Knoxville v. Knoxville Water Co., 212 U. S. 1, 14, 29 S. Ct. 148, 53 L. Ed. 371; Board of Public Utility Com'rs v. New York Telephone Co., 271 U. S. 23, 46 S. Ct. 363, 70 L. Ed. 808.

During such period the City used without charge the poles of the Pioneer Company and the Southwestern Company to carry its wires for its fire and police alarm systems. In 1926 and 1927 the City leased from the Southwestern Company wires to be used in connection with the City's police and fire alarm systems.

From 1923 to 1932 the Southwestern Company furnished free telephone service

to the City, which at authorized rates amounted to approximately $500 a year.

These facts militate strongly against the right of the City to claim compensation for past use of its streets and alleys, but in view of the conclusions we have reached on the broader questions presented, we deem it unnecessary to pass on these defenses.

The judgment is affirmed.