WALTER R. HOBLITZELL, PLAINTIFF, v. W. FRANCK HOWARD, ET ALS., DEFENDANTS.

Superior Court of New Jersey
Chancery Division

Decided April 8, 1953.

398

*Messrs. Hetfield & Hetfield (Mr. George F. Hetfield* appearing), attorneys for plaintiff.

*Messrs. Ruback, Albach & Weisman (Mr. Meyer E. Ruback* appearing), attorneys for defendants.

STEIN, J. S. C. Plaintiff, proceeding on order to show cause, seeks a preliminary injunction to accomplish, *pendente lite*, the following results: *viz.*, (a) the restoration to the plaintiff's custody of the minute book and other records of

the corporate defendant; (b) a restraint against the company and the defendants William C. Hoblitzell and W. Franck Howard from using corporate funds to pay any legal or accounting fees or tax deficiency which may arise out of a certain tax investigation mentioned in the complaint; (c) a restraint against the defendants John E. Toolan and Joseph J. Seaman from representing the corporate defendant either as attorneys or accountants; and (d) a restraint against the payment of corporate funds to one Walter Z. Hoblitzell (the father of the plaintiff and not a defendant herein). The matter was heard on affidavits, and at the conclusion of the argument I announced that the plaintiff had failed to show such situation as made imperative the allowance of a preliminary restraint and that no irreparable injury would result from the denial of such restraint. Accordingly an order denying the preliminary injunction and dismissing the order to show cause was entered. I am advised that an appeal has been taken from this order; hence this opinion of my reasons for the order under review.

The corporate defendant, H. O. B. Motors, Inc., was organized in 1949 to take over the then existing business operated by a copartnership known as H. O. B. Motor Sales. The copartners were three men related to one another, Walter Z. Hoblitzell (the father of the plaintiff), William C. Hoblitzell, and W. Franck Howard, the last two being, respectively, brother and brother-in-law of Walter Z. The copartnership had been in business for about 25 years and its success was due largely to the effort and ability of Walter Z. The newly-organized company immediately took over that partnership business and its good will and all its assets, for which it paid by issuing 1,500 shares of its common capital stock and by assuming all the liabilities of the partnership. Those shares were issued equally to the three selling partners, each receiving 500 shares, and an additional 10 shares were issued to the plaintiff. The four men then continued to serve as officers and directors of the company. However, in January, 1951, the father, Walter Z., resigned his office in the company and withdrew from all active partici-

pation in the business management. He had been in an accident, suffering a fractured skull and becoming physically disabled from further activity. Thereafter the business was conducted by the plaintiff and his two uncles. The plaintiff, however, ceased to be secretary in November, 1952, at which time he resigned from that office. Although the defendants' affidavits do not mention the fact of such resignation, the minute book was produced at the hearing and from it was read the minute of the plaintiff's resignation, which occurred at the meeting of the Board of Directors held on November 3, 1952. The fact of resignation was not denied by the plaintiff either in his affidavits or at the argument. For present purposes it is regarded as established.

It is undisputed that for some time there has been in progress by the United States Treasury Department a tax investigation of the business for the years 1947, 1948 and 1949 and the tax liability of the former partners whose business and assets the corporate defendant took over. In connection with that investigation corporate books and records were taken by Treasury representatives. That investigation is not yet ended and it is, of course, conceivable that there may be established some tax deficiency which, in turn, would attract interest and penalties. At this point an important issue emerges. The plaintiff says that this investigation does not concern the company but affects only the three individuals who were members of the antecedent partnership. The defendants insist, on the contrary, that since the corporation succeeded to all the business, good will and assets of the partnership and assumed all its liabilities, the company is, as such transferee, subject to the liability of any tax deficiency which may be established in connection with the earlier operation of the partnership business and that the company's assets may be called upon to respond for that liability. I think there can be no doubt about the validity of the defendants' position on the point in dispute. It has been held that a transferee's assumption of all existing liabilities includes a claim for deficiency in tax which was even unknown at the time of the transfer, and that although that liability had

not yet been determined by the Commissioner of Internal Revenue, the tax subsequently established constituted a liability as of the date of transfer. *Continental Baking Co. v. Helvering,* 64 *App. D. C.* 112, 75 *F. 2d* 243 (*Ct. App. D. C.* 1934), *certiorari* denied 295 *U. S.* 756, 55 *S. Ct.* 914, 79 *L. Ed.* 1699; *California Iron Yards Corp. v. Com.,* 82 *F. 2d* 776 (*C. C. A.* 9, 1936), *cert.* den. 299 *U. S.* 553, 57 *S. Ct.* 15, 81 *L. Ed.* 407; *Heyward v. United States,* 2 *F. 2d* 467 (*C. C. A.* 5, 1924); *In re Glover-McConnell Co.,* 9 *F. 2d* 683, 686 (*D. C. N. D. Ga.* 1925). In the two last-cited cases a partnership's assets were conveyed to a corporation in exchange for its stock and the corporation carried on the business in which the partnership had previously been engaged. In each case it was held that the corporation, as the transferee, was liable for the antecedent partnership tax, although the assessment therefor was not recorded until after the partnership assets had been acquired. It is no answer, as plaintiff attempts, that the partnership, as such, is not a taxpayer and files its tax return only for informational purposes. It is enough that the individual partners are taxable for their distributive shares of the partnership profits and that their liability for such taxes becomes the liability of an assuming transferee. Nor can it be claimed that the transferee (the corporate defendant) is an innocent purchaser for value and without notice. Here the corporation was on notice, since the very persons who were effectuating the transfer of the partnership assets were issuing to themselves the 1,500 shares of the company's stock. Further, the transferee company *expressly* assumed all liabilities and, as indicated in the cases last cited, this assumption included taxes not yet determined. Therefore the company itself, whether or not under direct tax investigation, is involved therein and stands materially to be affected thereby. A tax deficiency assessment against the partners may, in turn, be fastened upon the company and the corporate assets reached for purposes of satisfaction. Because of this hazard it is to the company's interest that it be represented and defended. In a very real sense the corporate

interest runs parallel with, not counter to, that of the former partners. It goes almost without saying that the plaintiff himself, though he was never a member of the partnership, is very much affected by whatever be the result of the tax inquiry. He himself is a transferee from his father of 500 shares of the company's stock. A tax deficiency against the father, as transferor, may well be imposed upon the plaintiff as transferee of that stock. A tax deficiency against the corporation will adversely affect the plaintiff to the extent of his one-third beneficial interest in the corporate assets. It would seem, therefore, that not only may the plaintiff profit from the corporate defendant's resistance to a tax deficiency but that the company itself, involved as a transferee, has the right, and its business managers have the duty, to employ counsel and accountants to make every reasonable effort to prevent a tax imposition and levy. I see nothing irregular in the company having engaged the defendants Toolan and Seaman to serve professionally in the tax inquiry. Their services to the company cannot conflict with any like service to those who were formerly the partners in the company's present business. It is undisputed that the two defendant-directors, Hoblitzell and Howard, voted a $4,000 retainer to Mr. Toolan and paid a $5,000 retainer to Mr. Seaman. Additional compensation has been accrued for Mr. Seaman and perhaps more will be paid to Mr. Toolan. Whether or not such sums are reasonable, may well await the fuller inquiry at the trial of the action. The uncontroverted proofs are to the effect that both these men have personal wealth vastly in excess of the amounts for which they can be called to account if ultimately the plaintiff's objections be sustained by the court. So far as payments to those two defendants are concerned, there is certainly no likelihood of an irreparable injury. Each has in writing, filed with the court, undertaken to make prompt repayment in the event final adjudication denies the right of the company to have paid them compensation or their right to receive the same. The defendants' good faith appears very clearly from the circumstance that insofar as the two defendant-directors

are concerned and the service to them *personally* by Mr.
Toolan, those two directors, out of their own personal funds,
paid Mr. Toolan a retainer of $2,500 in the tax matter.
There was thus exhibited a very fine regard for that dis-
tinction which exists between service to the individual direc-
tors and service to the company itself. It may be that at
final hearing, and depending upon the result thereof, the
individual directors may be entitled to reimbursement from
the company for the moneys so personally advanced by them.

██ Now as to the pension payments accrued on the books
of the company for the benefit of Walter Z. Hoblitzell, plain-
tiff's father. I am satisfied from the proofs before me that
the plaintiff acquiesced in the granting of this pension to the
disabled founder of the company's business. That consent
is not impaired by the condition which the plaintiff may
have sought to impose: namely, that the funds be not paid
to his father directly. There is nothing before the court to
indicate any incapacity in the pensioner to use the weekly
pension for the proper purpose of medical attention and for
sustenance. Aside from this, the disability pension was
granted by the vote of a majority of the directors, which
majority also owns two-thirds of the outstanding stock of the
company. Such pensions are within the sanction of *R. S.*
14:9–1(*c*). That legislation antedates the charter of the
corporate defendant, and the stockholders are deemed by their
charter to have contracted with regard to and in recognition
of that legislation. The plaintiff argues, however, that such
pension may not be granted in the face of any dissent from
any stockholder and that a dissenting stockholder is entitled
to compel the company to acquire his stock at its fair value,
all as provided for in *R. S.* 14:9–3. I find that that section
has no application, since it applies only to those benefits pro-
vided for in sections (a), (b) and (d). The pension here
involved is under subdivision (c).

██ The plaintiff faces no risk by the denial of a prelimi-
nary injunction. If at trial it be established that the
plaintiff is right in every objection and challenge expressed
in his complaint, his remedy will be complete and adequate.

The aggregate amount of things in dispute here is under $25,000. The four individual defendants are personally worth, above all liabilities, an aggregate sum in excess of $200,000. Their ability to respond on any surcharge ordered against them is abundantly established. More important, however, is the fact that the plaintiff owes the corporate defendant, as an unpaid balance on his promissory note, the sum of $95,000. In this amount the two defendant-directors have a personal interest to the extent of $63,333. The company itself has a net worth of over $200,000. If the things complained of are later adjudged to be wrongs, then the plaintiff will stand adversely affected to the extent of about $8,000. Reparation to him stands amply secured by the various items and considerations enumerated as aforesaid.

As to the minute book, stock transfer book and other corporate records, the plaintiff has no right of custody. He voluntarily resigned the office of secretary. If at the trial that resignation should for any reason, not yet made to appear, be denied effect, it will be time enough then to restore those books to the plaintiff's custody. There is no imperative reason why in the face of his undenied resignation he should hold those records in the interim.