LINCOLN NATIONAL LIFE INS. CO. v. READ, Ins. Commissioner, et al.

No. 31338. Nov. 21, 1944.

*156 P. 2d 368.*

Miley, Hoffman, Williams, France & Johnson, of Oklahoma City, for plaintiff in error.

Mac. Q. Williamson, Atty. Gen., and Fred Hansen, Asst. Atty. Gen., and Andy Crosby, Jr., of Oklahoma City, for defendants in error.

RILEY, J. The Lincoln National Life Insurance Company is a corporation, organized under the laws of the State of Indiana, and is engaged in the life insurance business. Honorable Jess G. Read is the duly elected Insurance Commissioner of the State of Oklahoma.

On March 27, 1942, the Lincoln National Life Insurance Company, hereinafter referred to as plaintiff, commenced this action against Jess G. Read, Insurance Commissioner, and Carl B.

Sebring, the then State Treasurer, hereinafter referred to as defendants, to recover the su mof $6,238.94 theretofore paid by plaintiff as the 4% premium or license tax, under the provisions of sections 1 and 2, art. 19, of the Constitution of the State of Oklahoma, and section 10478, O. S. 1931, as amended by Title 36, chapter 1a, Session Laws 1941 (36 O. S. 1941 § 104), and also referred to in the record as House Bill No. 353.

After the judgment herein reviewed was rendered, Honorable A. S. J. Shaw, who had in the meantime become State Treasurer, was substituted for Carl B. Sebring, State Treasurer, as party defendant. Plaintiff paid the license tax (or a part thereof) under protest, and brought this action to recover the entire amount of the taxes so paid. Defendants' demurrer to plaintiffs second amended petition, consisting of three alleged causes of action, was sustained. Plaintiff elected to stand on the petition as amended, whereupon the court entered judgment dismissing the cause. Plaintiff appeals.

The first cause of action assails the validity of the annual tax of 2% on all premiums collected by plaintiff in the state under the provisions of sections 1 and 2, art. 19, of the Constitution, and section 10478, O. S. 1931. A tax of 4% on such premiums was provided by section 1, ch. 1a, Title 36, Session Laws 1941 (36 O. S. 1941 § 104), House Bill No. 353, supra, amendatory of section 10478, effective April 25, 1941. These provisions of statute were construed by the State Insurance Commissioner and deemed applicable to the premiums collected by plaintiff in this state during the entire year of 1941.

Plaintiff alleges that the provisions of sections 1 and 2, art. 19, of the Constitution of Oklahoma, and the statutory provisions, as construed and applied by the Insurance Commissioner, unlawfully discriminate against plaintiff and in favor of life insurance companies organized under the laws of the State of Oklahoma, which are not required to pay a gross premium tax, or any other similar tax. Thereby it is alleged that there is violation of the 14th Amendment of the Constitution of the United States, and that plaintiff is deprived of equal protection of the law.

The second cause of action assails that part of the tax (if any other part thereof is valid) which was claimed by the State Insurance Commissioner and paid by plaintiff which represents 4% on $73,408.21 of plaintiff's premium collections, which plaintiff claims should have been deducted on account of cash surrender values paid to policyholders upon surrender, return, and cancellation of policy contracts.

The third cause of action assails that part of the tax represented by the increase of the rate from 2% to 4% on premiums collected by plaintiff during the year 1941, and prior to April 25, 1941, the effective date of the act amending section 10478, supra.

Defendants' demurrer to the petition as amended is upon three grounds: (1) Want of jurisdiction in the court of the subject matter of the action; (2) that the suit is one against the state and that there is no legislative authority or grant of the right to sue the state; and (3) that the petition as amended does not state facts sufficient to constitute a cause of action in favor of plaintiff and against defendant. The court sustained the demurrer upon the third ground. It is not contended here that either the first or second ground of the demurrer is well taken.

Section 1, article 19, of the Constitution of the State of Oklahoma, provides:

"No foreign insurance company shall be granted a license or permitted to do business in this State until it shall have complied with the laws of the State, including the deposit of such collateral or indemnity for the protection of its patrons within this State as may be prescribed by law, and shall agree to pay all such taxes and fees as may at any time be imposed by law or act of the Legislature, on foreign insurance companies, and a refusal to pay such

taxes or fees shall work a forfeiture of such license."

Section 2 of article 19 provides:

"Until otherwise provided by law, all foreign insurance companies . . . . shall pay to the Insurance Commissioner for the use of the State an entrance fee as follows:

"Each foreign Life Insurance Company, per annum, two hundred dollars; . . . .

"Until otherwise provided by law, domestic companies excepted, each insurance company, including surety and bond companies, doing business in this State, shall pay an annual tax of two per centum on all premiums collected in the State, after all cancellations are deducted, and a tax of three dollars on each local agent."

Section 10478, O. S. 1931 (first adopted in 1909), prior to the 1941 amendment, provided:

"Every foreign insurance company doing business in this State under the provisions of this article shall, annually, on or before the last day of February, report under oath of the president or secretary or other chief officer of such company to the insurance commissioner, the total amount of gross premiums received in this State within the twelve months next preceding the first of January or since the last return of such premiums was made by such company; and shall at the same time pay to the insurance commissioner an entrance fee as provided by Article XIX of the Constitution of the State of Oklahoma, and an annual tax of two per cent on all premiums collected in this State, after all cancellations and dividends to policy holders are deducted, and an annual tax of three dollars on each local agent, and such other fees as may be paid to said Insurance Commissioner, which taxes shall be in lieu of all other taxes or fees, and the taxes and fees of any subdivision or municipality of the State. Any company failing to make such returns and payments promptly and correctly shall forfeit and pay to the insurance commissioner, in addition to the amount of said taxes, the sum of five hundred dollars; and the company so failing or neglecting for sixty days

shall thereafter be debarred from transacting any business of insurance in this State until said taxes and penalties are fully paid, and the insurance commissioner shall revoke the certificate of authority granted to the agent or agents of that company to transact business in this State."

Said section, as amended in 1941, is substantially the same except the rate of the premium tax is 4% instead of 2%.

36 O. S. 1941 § 56 provides that the Insurance Commissioner shall furnish each insurance company authorized to do business in the state blank forms upon which to make annual reports, and that such companies shall annually, on or before the last day of February, file with the Insurance Commissioner a statement under oath showing their financial condition as of December 31st of the previous year, and:

". . . If the Insurance Commissioner finds that the facts warrant, and that all laws applicable to said company are fully complied with, he shall issue to said company a license or certificate of authority, subject to all requirements and conditions of the law, to transact business in this State, specifying in said certificate the particular kind or kinds of insurance it is authorized to transact, and said certificate shall expire on the last day of February next after its issue . . . "

The trial court in sustaining the demurrer held:

" . . . that neither Section 2, Article 19 of the Constitution of Oklahoma, Section 10478, Oklahoma Statutes 1931, or House Bill 353 of the 18th Oklahoma Legislature (Chapter 1a, Title 36, page 121, Oklahoma Session Laws 1941), nor the construction or application thereof by the Insurance Commissioner of Oklahoma referred to in plaintiff's second amended petition, violate the 14th Amendment of the Constitution of the United States or the Constitution of Oklahoma, and that neither said petition nor the 1st, 2d or 3d causes of action thereof state facts sufficient to constitute a cause of action in favor of plaintiff and against defendants, or either of them, and that hence defend-

ants' demurrer to said petition and to each of its said causes of action should be sustained . . . "

With reference to the first cause of action, the trial court held:

" . . . Under the pertinent constitutional and statutory provisions of this State, as construed in the case of New York Life Insurance Company v. Board of Commissioners of Oklahoma County, 155 Okla. 247, 9 P. 2d 636, and the uniform administrative practice of the State Insurance Commissioner since the effective date of the 1909 General Insurance Act of Oklahoma, said administrative practice being a matter of common knowledge of which the Court will take judicial notice:

"(A) when a foreign insurance company desires, for the first time, to enter Oklahoma and to do business therein, it is required, among other things, to file an application for a license to enter Oklahoma and do business therein to and including the succeeding last day of February, and to pay, on or before said date, a tax of two per centum (since April 25, 1941—four per centum) on all premiums, less proper deductions, which it receives in Oklahoma after it so enters the same and prior to the succeeding first day of January; that said tax is paid for the right or privilege of so entering Oklahoma and doing business therein to and including said last day of February, and that the license issued by the Insurance Commissioner to said company expires by operation of law and its express terms on said date, and

"(b) when such a licensed company desires to enter Oklahoma and do business therein during the ensuing license year (March 1 to and including the succeeding last day of February), it is required, among other things, to file on or before the last day of February of the current license year, an application for a license to enter Oklahoma and do business therein during said ensuing license year, and, as a condition precedent, to show payment of a tax of two per centum (since April 25, 1941—four per centum) on all premiums, less proper deductions, which it received in Oklahoma during the preceding calendar year, which payment was made for the privilege of having been permitted to enter Oklahoma and to do business therein during the then current license year, and to pay, on or before the last day of February of said ensuing license year, a similar tax on all premiums, less proper deductions, which it receives in Oklahoma during the preceding calendar year; that said tax is paid for the right or privilege of having been permitted to enter Oklahoma and to do business therein during said ensuing license year, and that the license issued by the Insurance Commissioner to said company expires by operation of law and its express terms at the end of said year."

As to the second cause of action, the court held:

" . . . that under the pertinent constitutional and statutory provisions of this State and the uniform administrative practice of the State Insurance Commissioner since the effective date of the 1909 General Insurance Act of Oklahoma, said administrative practice being a matter of common knowledge of which the Court will take judicial notice, the words 'after all cancellations are deducted' as used in Section 2, Article 19, of the Constitution of Oklahoma, and the words 'after all cancellations and dividends to policyholders are deducted,' as used in Section 10478, Oklahoma Statutes 1931, and Section 1, Chapter 1a, Title 36, page 121, Oklahoma Session Laws 1941, do not refer to or include cash surrender values paid by licensed foreign life insurance companies in this State to their Oklahoma policyholders."

With reference to the third cause of action, the court held:

" . . . that under the express provisions of Section 1, Chapter 1a, Title 36, page 121, Oklahoma Sessions Laws 1941, and the uniform administrative practice of the State Insurance Commissioner since April 25, 1941, the effective date of said Act, said administrative practice being a matter of common knowledge of which the Court will take judicial notice, the annual four per cent tax on premiums referred to in said section is levied and should be collected on all premiums received by licensed foreign insurance companies in this State, less proper deductions, 'within the twelve months next preced-

ing the first day of January,' 1942, as well as on all premiums, less proper deductions, received by said companies after said date."

It has been the uniform administrative practice of the Insurance Commissioner, since the effective date of the 1909 General Insurance Act of Oklahoma, when a foreign insurance company desires, for the first time, to do business in Oklahoma, to require it, among other things, to file an application for a license to expire on the last day of February next after its issue, and, on or before such date, to pay the gross premium tax imposed by law on all premiums, less proper deductions, received by it in Oklahoma from the date of the issuance of its license to and including the 31st day of December next; and when a foreign insurance company holding a license to do business in Oklahoma during any license year desires to do business therein during the ensuing license year, to require it, among other things, (a) to file, on or before the last day of February of the current license year, an application for a license for the ensuing year; (b) to pay the gross premium tax on all premiums, less proper deductions, received by it in Oklahoma during the preceding calendar year, as a condition precedent to the issuance of the license for the ensuing year; and (c) to pay, on or before the last day of February of the ensuing license year the gross premium tax on all premiums, less proper deductions, received by it in Oklahoma during the preceding calendar year; and since the effective date of such act the Insurance Commissioner has uniformly interpreted such act as providing for a license, to expire on the last day of February next after its issuance; and in issuing renewal licenses has uniformly construed it as requiring the payment, on or before the last day of February in each year, of the gross premium tax for the right or privilege of entering Oklahoma and doing business therein during the license year expiring on that date.

Under the law licenses issued to foreign insurance companies expire on the last day of February next after the date of their issuance. If the construction and interpretation by the administrative officer and the court of the constitutional and statutory provisions quoted above is permissible, there is no invalidity in the gross premium tax therein provided.

It is well settled that a state may withhold from a foreign corporation the privilege of doing business within its borders entirely. It may grant such privilege or authority on such conditions as it may deem fit. Williams v. Standard Oil Co. of Louisiana, 278 U.S. 235, 73 L. Ed. 287; Hanover Fire Insurance Co. v. Carr, Treasurer, 272 U.S. 494, 71 L. Ed. 372. These general rules are subject to a well-settled qualification that a state may not impose conditions which require the surrender of rights guaranteed by the Federal Constitution. The power of a state to exact a gross premium tax from a foreign insurance company for the privilege of doing business within the state is likewise well settled. Philadelphia Fire Association v. New York, 119 U.S. 100, 30 L. Ed. 342.

It is the contention of plaintiff that because the gross premium tax involved is not payable and could not be computed or collected until the close of the year 1941, it cannot be held as a valid tax for the privilege of doing business in the state during that year.

It is not essential that a privilege tax be paid before the exercise of the privilege. Payment may precede or follow the exercise of the privilege, depending upon which system the Legislature chooses to adopt. Carpenter, Insurance Commissioner, v. Peoples Mutual Insurance Co., 10 Cal. 2d 299, 74 P. 2d 508; William A. Slater Mills, Inc., v. Gilpatric, State Treasurer, 97 Conn. 521, 117 Atl. 806; Pacific Mutual Life Insurance Co. v. Hobbs, Commissioner of Insurance, 154 Kan. 230, 103 P. 2d 854.

In the latter case it was held:

"1. The statute requiring foreign insurance companies, at the time of mak-

548

ing annual statements required by law, to pay taxes on the gross amount of premiums received by them for business done in the state during the preceding year, imposes taxes, payable at the end of the year, for the privilege of doing business in the state."

"3. The tax on gross premiums received by foreign insurance companies for business done in the state is an 'excise tax' in the nature of a franchise or privilege tax on the privilege of doing business, and partakes of the nature of a license tax in the sense that payment thereof is required as a condition precedent to the renewal of certificates of authority of such companies."

In the body of the opinion it is stated:

"The tax is an excise or privilege tax. The company was given the privilege of doing business in the state. Upon what basis is the tax to be imposed? Obviously upon the volume of business done during the previous year. On the 1st day of January or within sixty days thereafter, the company is required to make a return showing the business done during the previous year. The tax is on the privilege of doing business in the state—the tax fixed at a percentage of premiums received during the preceding year. The payment of the tax follows the exercise of the privilege. The method selected appears to be both equitable and convenient."

Sections 1 and 2, art. 19, of the Constitution, together with the statutory provisions above quoted, permit the construction that the payment of a gross premium tax on or before the expiration of the license year for the privilege of doing business in the state during the license year is a condition precedent to the issuance of a license for the ensuing year. This has been the uniform construction and application of the law by the executive department of the state charged with the administration of the law. It was in effect so held by the trial court. See, also, Great Northern Life Insurance Company, a Corporation, v. Jess G. Read, Insurance Commissioner for the State of Oklahoma, 136 Fed. 2d 44 (pending on proceedings in error in the Supreme Court of the United States). That the law

calls for the payment of the tax for the privilege of doing business in this state is clear by the provisions of sections 1 and 2, art. 19, of the Constitution. Section 1 prohibits the licensing of all foreign insurance companies to do business in this state until they shall have complied with the laws of the state and shall have agreed to pay all taxes and fees as may at any time be imposed by law or act of the Legislature. Section 2 of article 19 prescribes one fee a foreign life insurance company is required to pay, namely, $200 per annum. The amount of that fee may not be changed except by amendment of the Constitution. The latter part of section 2 fixes the tax which foreign insurance companies were required to pay until otherwise provided by law, namely, the annual tax of two per centum on all premiums collected in the state after all cancellations are deducted. That was the tax imposed by law referred to in section 1. That tax was subject to change by the Legislature. It was so changed in 1909 (section 10478, supra) by allowing deductions for dividends paid to policyholders as well as all cancellations and by adding an annual tax of $3 on each local agent. That act made such taxes payable to the State Insurance Commissioner and provided that the tax should be in lieu of all other taxes or fees of any subdivision or municipality of the state. The only material change made by the 1941 amendment is to increase the rate of tax from two per centum to four per centum.

It is clear that payment of such tax at the end of the licensing year was intended. The reason is that the amount of such tax is dependent on the amount of premiums collected during the taxing year and could not be determined until the end of such year. The tax imposed is clearly a privilege tax. New York Life Insurance Company v. Board of Commissioners of Oklahoma County, 155 Okla. 247, 9 P. 2d 636. It is payable at the end of the year during which the privilege is granted by the state and exercised by the insurance company. This is in accord with the departmental con-

struction of the law for more than 30 years. Such departmental construction does not appear to have been challenged by any foreign insurance company during the 32 years from 1909 until the amendment of 1941. This long-continued departmental construction should not be overturned without cogent reasons. Globe Indemnity Company v. Bruce, 81 Fed. 2d 143; City of Tulsa v. Southwestern Bell Telephone Company, 75 Fed. 2d 343; United States v. Jackson, 280 U. S. 183, 74 L. Ed. 361; Federal Land Bank v. Warner, 292 U. S. 53, 78 L. Ed. 1120.

Plaintiff cites and relies strongly on Hanover Fire Insurance Company v. Carr, 272 U.S. 494, 71 L. Ed. 372, supra. It relies on the fact that the tax there involved was held to violate the 14th Amendment and deprived the insurance company of equal protection of the law. That case may well be distinguished from the case at bar as to the tax there held to be invalid. The Hanover Fire Insurance Company was an insurance company organized under the laws of the State of New York. It had for a number of years conducted a fire insurance business in South Chicago, Cook County, Illinois, through agencies maintained there. In 1919, the State of Illinois enacted a statute which provided that each foreign corporation licensed and admitted to do an insurance business in the state should pay an annual state tax for the privilege of doing business in the state equal to two per centum of the gross amount of premiums received by it during the preceding calendar year on contracts covering risks within the state, after certain deductions, and that such tax should be in lieu of all license fees or privilege or occupation taxes levied or assessed by any municipality of the state, but this should not be construed so as to prohibit the levy and collection of any state, county or municipal taxes upon the real and personal property of such corporations. There was no contention as to the validity of that tax. The State of Illinois also had in effect a statute known as the Fire and Marine Insurance Act of 1869, as amended (Cahill's Rev. Stat. 1925, Chapter 73). Section 30 of said act in part provided:

"Every agent of any insurance company, incorporated by the authority of any other state or government, shall return to the proper officer of the county, town or municipality in which the agency is established, in the month of May, annually, the amount of the net receipts of such agency for the preceding year, which shall be entered on the tax lists of the county, town and municipality, and subject to the same rate of taxation, for all purposes—state, county, town and municipal—that other personal property is subject to at the place where located; . . . "

A general revenue act of the State of Illinois, adopted in 1898, required personal property to be valued at its fair cash value and set down in one column headed "Full Value" and one-half thereof to be ascertained and set down in another column headed "Assessed Value." In 1923, and for many years prior thereto, by what was called an equalization, systematically and intentionally carried out, the amount set down in the "Full Value" column was not more than 60% of the actual fair cash value of personal property returned, and the amount set down in the "Assessed Value" column was not more than 30% of the actual, fair cash value, so that taxes on personal property would be levied and collected on an assessed value of 30% of the full or fair cash value of the property. For a long time and in a long line of decisions the Supreme Court of Illinois had held that the tax imposed by section 30, supra, on the net receipts of foreign insurance companies was a tax on personal property. Accordingly, such net receipts had been treated as personal property. The law was enforced under that construction for a long time, with full acquiescence by the foreign insurance companies. But in June, 1923, in People ex rel. Chicago v. Barrett, 309 Ill. 53, 139 N. E. 903, the Supreme Court of Illinois held that said tax was an occupation tax and that the value of the net receipts of foreign insurance companies should not be reduced as in the case of personal property. The result

550

was that the tax imposed by section 30, supra, was more than trebled. It was this tax so increased which was attacked in the Hanover Case, supra. It appears that after said decision the taxing authorities of Cook County, Illinois, valued and assessed the net premium receipts at their full value and levied a tax accordingly, and issued a warrant for the collection of the same. To prevent a distraint of its property, the Hanover Company brought an action against the tax collector for an injunction. The trial court denied relief and the Supreme Court affirmed the superior court. Hanover Fire Insurance Company v. Carr, 317 Ill. 366. The case was taken by writ of certiorari to the Supreme Court of the United States. There it was held in effect that the tax under the law as last construed by the Supreme Court of Illinois worked an unlawful discrimination against the Hanover Fire Insurance Company. It was held that the authority or license granted under the 1919 Act, for which the Hanover Company paid the 2% tax on gross premiums received by it, put said company on a level with domestic insurance companies doing a like business; that compliance with section 30 of said act was not a condtion precedent to permission to do business in Illinois. The tax under the law as previously construed, however, was in substance upheld. With reference thereto the court said:

" . . . Under the previous decisions of the Supreme Court of Illinois, when the net receipts were treated as personal property and the assessment thereon as a personal property tax subjected to the same reductions for equalization and debasement, it might well have been said that there was no substantial inequality as between domestic corporations and foreign corporations, in that the net receipts were personal property acquired during the year and removed by foreign companies out of the state, and could be required justly to yield a tax fairly equivalent to that which the domestic companies would have to pay on all their personal property including their net receipts or what they were invested in. It was this view, doubtless, which led to the ac-

quiescence by the state authorities and the foreign insurance companies in such a construction of § 30 and in the practice under it . . . "

Final disposition of the Hanover Case, as shown in Hanover Fire Insurance Company v. Harding, County Collector, 327 Ill. 590, 158 N.E. 849, is that the tax was upheld as upon a debased or decreased valuation of the net receipts in accordance with the former decisions. The 2% gross premium tax levied under the law in Illinois, almost the same as the Oklahoma law as construed by the department and the court below as a privilege tax or license tax, was upheld.

In the case at bar, the state exacts payment on or before the last day of February of each year of a valid privilege tax, based upon gross premiums collected for the privilege of doing business in this state during the license year, expiring on the date upon which the tax was required to be paid, and also requires a showing of timely payment of such tax as a condition precedent to the issuance of a license for the ensuing year. As we have seen, the date when the payment for the privilege of doing business in the state is required is not material. It may be before or at the end of the license year.

Incidentally, it may be noted that the plaintiff did not protest payment of the tax as a whole. Examination of the two protests filed, copies of which are attached to the amended petition, shows that in the first protest, dated February 26, 1942, only $1,651.31 was protested. That was protested as being tax in excess of 2% of all premiums collected in Oklahoma on insurance policies during the calendar year of 1941. In the second protest, dated March 17, 1942, $2,936.33 was protested as a tax excessive and void because deductions claimed for cancellations were not allowed by the Insurance Commissioner. That made a total tax protested of $4,-587.64. The total amount paid and the amount sued for was alleged to be $6,-238.94. That leaves $1,651.30 not protested. Evidently plaintiff, at the time it filed its protests, considered the 2%

levied by the law under section 10478, before its amendment, was a valid tax. At least it did not protest that part thereof.

From the foregoing authorities we conclude that 36 O.S. 1941 § 104 does not violate the 14th Amendment, and does not deprive the plaintiff of equal protection of the law.

We next consider the demurrer as applied to the second cause of action. The question is presented by plaintiff in its brief under the third proposition. Thereunder plaintiff contends that the "cancellations" to be deducted as provided in the Constitution and statutes above referred to necessarily consist of the return of premiums, including cash surrender values paid to policyholders, according to the terms and provisions of the life insurance contracts. The argument is that these funds are accumulated under the level premium plan by charging, during the early years of the policy, a net premium which is larger than is necessary to pay for the insurance in those years, with a view of accumulating a fund large enough to enable the company to meet the cost of insurance in the later years of life of the insured when the net premium is insufficient to pay for the current cost of protection, and that upon surrender of the policy by the insured, the payment to him of the "cash surrender value" is nothing more than a return of the excess part of the premiums theretofore charged and collected with an assumed rate of interest, and is but a return of money that in reality belongs to the insured. One difficulty with that theory is that the "assumed rate of interest" is not necessarily the actual rate of interest or income derived from the use of such money while in the hands of the insurer.

The defendants contend that the words "after all cancellations are deducted" refer only to the unearned parts of premiums on insurance policies collected in advance for a given term where the policies are canceled prior to the expiration of such term under the provisions of the policy or of the law relating thereto, and which unearned premiums are returned to the policyholder; that when used in connection with a life insurance policy, the words are applicable only in instances where policies have been procured by fraud, mistake, etc., and the policies are canceled and the premium is returned without respect to the length of time the policy has been in existence; that the return of the entire premium collected in such cases is called for because the policy never had any validity and no risk was ever assumed thereunder.

There is no case cited by plaintiff directly in point. Volunteer State Life Insurance Company v. Larson, State Treasurer, 147 Fla. 118, 2 So. 2d 386, construed a statute similar to our constitutional and statutory provisions, which directed the State Treasurer in collecting the amount due upon a gross premium tax of 2% to omit or deduct "return premiums and cancellations." Our law directs deduction of "all cancellations and dividends paid to policyholders."

The Supreme Court of Florida, in Volunteer State Life Insurance Company v. Larson, supra, stated in substance, as contended for by plaintiff in the case at bar, that "the legislative intent is so clear and well fixed that the duty of the court here is to follow the plain language implied by it." It was there held that deductions for surrender value of the policies, paid to the policyholders during the year, were required. But State ex rel. Pacific Mutual Life Insurance Company v. Larson, State Treasurer, etc. (Fla.) 12 So. 2d 896, expressly overrules Volunteer State Life Insurance Company v. Larson, supra. In State ex rel. Pacific Mutual Life Insurance Company v. Larson, supra, it is pointed out that the cash surrender values on policies of life insurance are property rights generally created or established by the provisions of the contracts of life insurance. In the opinion it is stated:

"Various items, according to each contract, may enter into, include, and compose the property right recognized

552

as the 'cash surrender value of a policy.' The payment by the insurance company to the policyholder of the 'cash surrender value of a policy' and the surrender thereof by the policyholder to the insurance company is not a 'cancellation' within the terms of the act, but is simply a performance of the obligations of the contract as originally entered into by the parties. The policy, when cashed and surrendered as between the parties, becomes functus officio. It was not the intention of the Legislature when using the term 'cancellation' to make it embrace or include the 'cash surrender value of a policy of life insurance'."

We approve the statements there made. It is clear that the payments of the cash surrender value as provided in the policies are but the fulfillment of the contracts of insurance as written. It is no more a cancellation of the policy within the meaning of the Constitution and statutes than is the full payment on insurance policies at maturity or the payment of the principal amount of the contract upon the death of the insured. In either case the provisions of the policies are performed.

We hold that the payment for cash surrender value as provided for in the policy is not a cancellation within the terms or within the meaning of the Constitution and statutes. There was no error in sustaining the demurrer as to the second cause of action.

Under the second proposition in plaintiff's brief, going to the third cause of action, it is contended that the increase in the tax from 2% to 4% effective April 25, 1941, could in no event operate as to premiums collected by plaintiff prior to April 25, 1941.

As applied to plaintiff's third cause of action, the petition as amended does not challenge the validity of the increase in the rate of tax from 2% to 4% as to premiums collected after April 25, 1941. It goes only to the validity of the increase of the tax as applied to premiums collected in 1941, prior to April 25th. That part of the tax was not specifically protested.

68 O.S. 1941 § 15.50, under which authority for an action of this nature is given, requires that the notice (protest) to the collecting officer shall show the "grounds of complaint." The Attorney General makes no contention that the notice or protest here involved is insufficient. We therefore treat it as sufficient to raise the question here presented.

The sole question involved is whether increase in rate of taxes to be paid is legally applicable to premiums collected in 1941 but prior to April 25th, the effective date of the act raising the rate of the tax. By the language used in the statute as amended, the increased rate is not specifically made retroactive. The general rule is that statutes are to be construed as having a prospective operation unless the purpose and intention of the Legislature to give them retrospective effect is expressly declared or is necessarily implied from the language used. In every case of doubt, the doubt must be resolved against the retrospective effect. Good et al. v. Keel et al., 29 Okla. 325, 116 P. 777; People ex rel. Mutual Trust Company of Westchester County v. Miller, Comptroller, 177 N. Y. 51, 69 N. E. 124; Blodgett v. Holden, 275 U. S. 142, 72 L. Ed. 206; Lewellyn v. Frick, 268 U. S. 238, 69 L. Ed. 934.

In Good v. Keel, supra, it is said:

"This general rule has been applied to a great variety of statutes, including the uniform negotiable instruments law, usury laws, statutes levying taxes, relating to defenses to actions on insurance policies, relating to damages for wrongs, providing for rendition of deficiency judgments upon sale of mortgaged premises, limiting the time for the commencement of actions, declaring certain contracts void, regulating parties who may sue for death by wrongful act, or the manner of distribution of the amount recovered, modifying the fellow servant rule, relating to plans for bridges over railroad tracks, relating to mechanics' liens, defining the boundary of a city, etc. . . . "

This being a tax for the privilege of doing business within the state during

the year for which the privilege is granted by the state and exercised by the insurance company, as we have held, plaintiff became subject to the increased rate during the license year. But there is nothing in the act which specifically provides that the increased rate should apply to premiums collected prior to the effective date of the act increasing the rate. Neither can it be said that such application is necessarily implied from the language used in the act. Tested by the rule stated above, the act must be construed so as to apply the increased rate only to the premiums collected after the effective date of the act.

The petition alleged the amount of premiums collected in 1941 before April 25th, and alleged the amount of dividends paid to policyholders during that time. Therefore, plaintiff's petition as to the third cause of action stated facts sufficient to constitute a cause of action for the recovery of the amount of taxes, hereinafter set forth, paid by plaintiff in error by reason of the application of the increased rate to the premiums collected prior to the effective date of the act increasing the rate.

The parties having filed herein their joint motion and stipulation whereby they agree that there exists no issue as to the facts set out in the petition and that the amount of the tax involved in said third cause of action is the sum of $847.18, and pray that this court completely determine and adjudicate this action. This court is vested with jurisdiction of the parties and subject matter involved. Further proceedings in the trial court could result in no benefit to any of the parties and would only involve the litigants in more expense and delay and nothing could be gained thereby. The approval of said stipulation is in the furtherance of justice.

The order of the trial court in sustaining the demurrer to the first and second causes of action is affirmed.

The order sustaining the demurrer to the third cause of action and the judgment dismissing the petition are reversed.

The court, in consideration of the premises, finds and determines that $847.18 of the $6,238.94 sued for by plaintiff in error was illegally collected, as not being due the State of Oklahoma, but that the remainder of said sum, to-wit, $5,391.76, was legally collected, as being due the State of Oklahoma.

It is, therefore, ordered, adjudged, and decreed by the court that the first and second causes of action of the petition of plaintiff in error be and the same are hereby dismissed and that the legal amount of taxes due by plaintiff in error to the State of Oklahoma is the said sum of $5,391.76.

It is also ordered, adjudged and decreed by the court that the said sum of $847.18 so paid is in excess of the legal and correct amount due by plaintiff in error to the State of Oklahoma, and defendants in error are hereby ordered and directed to pay said excess to plaintiff in error and to take its receipt therefor.

It is further ordered and adjudged that the costs herein be paid by plaintiff in error.

CORN, C. J., and OSBORN, BAYLESS, WELCH, HURST, DAVISON, and ARNOLD, JJ., concur.

GIBSON, V.C.J., dissents to paragraph 8 of the syllabus and to that part of the opinion of which said paragraph 8 is representative, but concurs in the remainder of said opinion.